

FILED

Feb 13 2018, 7:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

William M. Horne
Horne Law LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Kyle Hunter
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| John E. Moriarity and Mae E. Moriarity, <br><br> *Appellants-Petitioners,* <br><br> v. <br><br> Indiana Department of Natural Resources, <br><br> *Appellee-Respondent.* | February 13, 2018 <br><br> Court of Appeals Case No. 27A04-1612-PL-2731 <br><br> Appeal from the Grant Circuit Court <br><br> The Honorable Mark E. Spitzer, Judge <br><br> Trial Court Cause No. 27C01-1511-PL-73 |

**Najam, Judge.**

## Statement of the Case

[1] John and Mae Moriarity (collectively "the Moriaritys") appeal the trial court's order in which the court affirmed the decision of the Natural Resources Commission ("the Commission") in favor of the Indiana Department of

Natural Resources ("DNR") following the DNR's notice of violation issued to the Moriaritys and final order thereon. The Moriaritys present three issues for our review, which we restate as follows:

1.      Whether the DNR erred when it exercised jurisdiction over the Moriaritys' dam.

2.      Whether the DNR's determination that the Moriaritys' dam is a "high hazard" dam is supported by substantial evidence.

3.      Whether the Moriaritys preserved for appellate review their claim that the DNR exceeded its statutory authority when it entered an order that did not expressly allow for the possibility that the Moriaritys could make modifications to their dam and lake to remove them from the DNR's jurisdiction.

[2]      We affirm.

## Facts and Procedural History[1]

[3]      The Moriaritys own farm land in Grant County. Between 1997 and 2000, John constructed a dam and a lake on the farm, and he stocked that lake with fish. The dam is more than twenty feet high at some points, the lake has a surface

---

[1] We held oral argument in this case on October 30, 2017. On October 31, we ordered the parties to participate in mediation pursuant to Appellate Rule 20. The parties participated in mediation but were unable to reach a mediated resolution of the case.

area of approximately forty acres, and the lake contains more than 100 acre-feet of water.[2]

[4] During the course of the construction, the Moriaritys were in contact with the DNR about any relevant permits the Moriaritys might need, but the DNR did not instruct them to obtain any specific permits from the DNR. Nonetheless, between 2002 and 2008, the DNR issued to the Moriaritys a notice of violation ("NOV") with respect to the dam on at least three separate occasions. The Moriaritys either did not comply with those NOVs or had them subsequently dismissed by a trial court. On May 14, 2012, the DNR issued another NOV to the Moriaritys. The 2012 NOV alleged, in relevant part, that the Moriaritys' dam was in violation of Indiana's Dam Safety Act, Ind. Code Ann. §§ 14-27-7.5-1 to -16 (West 2011).

[5] The Moriaritys sought administrative review of the 2012 NOV. At an ensuing fact-finding hearing, the DNR presented expert testimony that streams existed on the Moriaritys' property. The DNR's experts further testified that the Moriaritys' lake was created by the damming of those streams.

[6] The DNR also presented the testimony of Kenneth Smith, the DNR's assistant director of the water division, who testified that the Moriaritys' dam was a

_____

[2] The Dam Safety Act does *not* apply to a structure that meets all of the following conditions: is built for the sole purpose of erosion control, watering livestock, recreation, or providing a haven or refuge for fish or wildlife; has a drainage area above the dam of not more than one square mile; does not exceed twenty feet in height; and does not impound a volume of more than one hundred acre-feet of water. Ind. Code § 14-27-7.5-1(1) (2017). The Moriaritys have stipulated that their structure impounds more than one hundred acre-feet of water and, as such, does not meet all of the conditions of Section 14-27-7.5-1(1).

"high hazard" dam. In particular, Smith testified that it is "not that hard to tell a High-Hazard Dam. You can stand on the dam, literally can look downstream of it and see things that are in harm's way." Appellants' App. Vol. II at 106. Smith further testified that, looking out from the Moriaritys' dam, it was "visually obvious" that that dam "was a High-Hazard Dam" due to the presence of several structures that, if a breach occurred, would be inundated "with great velocity and depth." *Id.* at 129. Similarly, George Crosby, a DNR geologist, testified that, if the dam "breaks above the house [of the Moriaritys' son, who lived nearby], it's likely that there could be some serious damage to that house and . . . to other homes, too." Appellants' App. Vol. III at 45. Crosby further testified that, "even without the homes, . . . this thing would still be considered High-Hazard . . . due to [a downstream] road because of the traffic; that's a very high-traffic road." Appellee's App. Vol. III at 188.

[7] Following the fact-finding hearing and oral argument, the Commission entered its order for the DNR and against the Moriaritys, which the Commission supported with findings of fact and conclusions of law. The Commission's "Final Order" stated as follows:

> 1. [The Moriaritys] . . . are hereby ordered to draw down the water level in the Moriarity impounded lake to an elevation of between 840 and 845 feet NAVD. They shall . . . consult with a professional engineer duly licensed in Indiana . . . to develop a safe and appropriate dewatering plan for accomplishing the draw down as herein ordered.
>
> 2. The water level of the impounded lake shall be maintained at between 840 and 845 feet NAVD until the Moriaritys . . . have

complied with the remainder of this Order as set forth below in Paragraphs 3 and 5.

3. [The Moriaritys] . . . are hereby ordered to comply with I.C. [§] 14-27-7.5-9(a) by having their dam inspected by a professional engineer . . . and submitting a report of that inspection to the DNR's Division of Water within ninety (90) days of the issuance of a final order in this proceeding. . . .

4. [The Moriaritys] . . . are hereby ordered to comply with I.C. [§] 14-27-7.5-9(b) by completing any maintenance, repair, or alteration as required to fulfill the usual and customary requirements of the DNR.

5. In lieu of compliance with Paragraphs 1 through 4 above, [the Moriaritys], . . . under the direction of a professional engineer . . . [may ] dewater, breach, and permanently decommission the dam.

6. [The Moriaritys] . . . are hereby ordered to pay [a total of $10,000 in] civil penalties for their violations of the Dam[] Safety Act. . . .

Appellant's App. Vol. II at 56-57. The Moriaritys filed a petition for judicial review thereafter, and the trial court affirmed the Commission's decision. The Moriaritys filed a motion to correct error with the trial court, which was subsequently deemed denied. This appeal ensued.

# Discussion and Decision

### *Standard of Review*

[8] Our standard of review is well settled:

Pursuant to Indiana's Administrative Order[s] and Procedures Act ("AOPA"), we may set aside an agency action only if it is

> (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence.

Ind. Code § 4-21.5-5-14(d) (Supp. 2012). The party seeking judicial review bears the burden of proving the agency action is invalid for one of the above five reasons. *Id.* § 4-21.5-5-14(a).

Further, when reviewing a challenge to an administrative agency's decision, "this Court will not try the facts de novo nor substitute its own judgment for that of the agency." *State Bd. of Registration for Prof'l Eng'rs v. Eberenz*, 723 N.E.2d 422, 430 (Ind. 2000) (citing *Ind. Dep't of Envtl. Mgmt. v. Conard*, 614 N.E.2d 916, 919 (Ind. 1993)). Rather, we defer to the agency's findings if they are supported by substantial evidence. *Ind. Dep't of Envtl. Mgmt. v. West*, 838 N.E.2d 408, 415 (Ind. 2005).

On the other hand, we review an agency's conclusions of law de novo. *Nat. Res. Def. Council v. Poet Biorefining-N. Manchester, LLC*, 15 N.E.3d 555, 561 (Ind. 2014).

*Jay Classroom Teachers Ass'n v. Jay Sch. Corp.*, 55 N.E.3d 813, 816 (Ind. 2016).

### Issue One: DNR's Jurisdiction

The Moriaritys first contend that the DNR erred when it exercised jurisdiction over their dam. In particular, the Moriaritys assert that the DNR misinterpreted the Indiana Code; that the DNR's assertion of jurisdiction under

the Dam Safety Act here is not supported by substantial evidence; and that the DNR's erroneous exercise of jurisdiction denied the Moriaritys due process and resulted in an arbitrary and capricious decision. We address each of the Moriaritys' arguments in turn.

*Statutory Construction*

[10] We first turn to the Moriaritys' claim that the DNR misinterpreted its jurisdiction under the Indiana Code. In particular, the Moriaritys allege that the "DNR's jurisdiction hinged on whether the fish pond—or, more technically, its 'structure'—was built 'in, on, or along' a stream." Appellants' Br. at 21. "'To the extent the issue turns on statutory construction, whether an agency possesses jurisdiction over a matter is a question of law for the courts.'" *Walczak v. Labor Works-Ft. Wayne LLC*, 983 N.E.2d 1146, 1152 (Ind. 2013) (quoting *Ind. Dep't of Envtl. Mgmt. v. Twin Eagle LLC*, 798 N.E.3d 839, 844 (Ind. 2003)).

[11] As the Indiana Supreme Court has explained:

> When construing a statute our primary goal is to ascertain the legislature's intent. *Adams v. State*, 960 N.E.2d 793, 798 (Ind. 2012). To discern that intent, we look first to the statutory language itself and give effect to the plain and ordinary meaning of statutory terms. *Pierce v. State*, 29 N.E.3d 1258, 1265 (Ind. 2015). "If a statute is unambiguous, that is, susceptible to but one meaning, we must give the statute its clear and plain meaning." *State v. Evans*, 810 N.E.2d 335, 337 (Ind. 2004) (quotation omitted).

*Suggs v. State*, 51 N.E.3d 1190, 1193-94 (Ind. 2016).

[12] Indiana Code Section 14-27-7.5-8(a)(1) (2017) provides in relevant part that the DNR has "jurisdiction . . . over the maintenance and repair of structures in, on, or along . . . streams." The statute does not define "streams." But that term has a plain and ordinary meaning, namely, "a body of running water flowing in a channel on the surface of the ground[.]" Webster's 3d New Int'l Dictionary 2258 (2002). And the Commission used that plain and ordinary meaning here:

> [t]he DNR's witnesses all provided definitions of "stream" as flowing water through a defined channel. The DNR's definition is consistent with the definitions provided by the parties as Exhibit 3, which includes definitions from both standard English dictionaries and technical dictionaries. The Moriaritys argue that [the definition proffered by their expert witness, Heather Bobich,] should be used. She relies upon the Army Corps of Engineers' definition. However, it is not necessary to use a technical definition of "stream." The legislature chose to use the word "stream" and chose not to define it. As "stream" has a common meaning, the failure to define it supports the conclusion that the legislative intent must have been to use the plain and ordinary meaning. . . . Applying the rules of statutory construction, "stream" is clear and unambiguous and requires no further interpretation.

Appellants' App. Vol. II at 51. We agree with the Commission and hold that the term "stream" is unambiguous and means a body of running water flowing in a channel on the surface of the ground.

[13] Still, the parties dispute whether, to constitute a stream under the statute, a body of running water must flow continuously in a channel or may flow

intermittently. Here, while the DNR presented evidence of flowing water in streams on the property, Bobich testified that she observed no flowing streams in 2012, which, she conceded, was "a hot and very dry year." *Id.* at 46. After concluding that there were streams on the Moriaritys' property, the Commission also concluded that "[t]he fact that water does not flow constantly is not determinative." *Id.* at 52.

[14] We agree with the DNR. As the DNR points out, the Moriaritys' suggestion that only structures along continuously flowing streams fall under the DNR's jurisdiction

> ignores the variableness of the weather and the seasons, and it would exclude streams that might have a significant volume of flowing water for the majority of the year and then dry up for a couple weeks during the hottest part of the summer or during a year of extreme dr[o]ught.

Appellee's Br. at 26-27. We also agree that "[u]sing a broader meaning of the word 'stream' is especially appropriate here[] because the purpose of the Dam Safety Act is to protect the public and ensure that dams and other structures on water are maintained in good repair." *Id.* at 25-26. Absent a clear intent from our legislature to the contrary, we hold that, as a matter of law, both continuously flowing and intermittent streams constitute streams under the statute.

*Sufficiency of the Evidence*

[15]     The Moriaritys next contend that the DNR presented insufficient evidence to prove that it had jurisdiction over their dam and lake.  However, that contention amounts to a request that we reweigh the evidence, which we cannot do.  Again, Indiana Code Section 14-27-7.5-8 provides that the DNR has jurisdiction over the maintenance and repair of structures in, on, or along streams.  And the DNR presented testimony from several experts who stated unequivocally that streams existed on the Moriaritys' property and that the lake was created by damming those streams.  We hold that the DNR presented sufficient evidence to prove that it had jurisdiction over the Moriaritys' dam and lake pursuant to Indiana Code Section 14-27-7.5-8, and the Moriaritys have not shown that the Commission's decision is contrary to law.

*Derivative Arguments*

[16]     The Moriaritys also assert that the DNR's erroneous exercise of jurisdiction deprived the Moriaritys of their right to due process[3] and, similarly, resulted in an arbitrary and capricious decision by the Commission.[4]  But these arguments are derivative of the Moriaritys' contention that the DNR unlawfully exercised

[3] In particular, the Moriaritys maintain that, because there are multiple definitions of "stream" depending on which dictionary is consulted, there were no ascertainable standards by which they had fair notice that the DNR had jurisdiction over their streams.

[4] In particular, the Moriaritys assert that, "[i]n the absence of a plain and ordinary meaning of 'stream, . . . [the] DNR's choice of a stream definition was arbitrary, and its determination [here] was arbitrary and capricious."  Appellants' Br. at 33.

jurisdiction here. As explained above, the DNR did not unlawfully exercise its jurisdiction. As such, the Moriaritys' derivative arguments must fail.

### Issue Two: High Hazard Dam

[17] The Moriaritys also contend that the Commission's determination that their dam is a "high hazard dam" under Indiana Code Section 14-27-7.5-8(b) is erroneous. In particular, the Moriaritys claim that a computerized inundation study conducted by one of the DNR's experts, Suzanne Delay, was "fatally flawed because it was based on a starting water elevation that undisputed evidence showed to be 2.3 feet higher than the top of the dam at its starting point or 'breakout point,' as measured and described by [the] DNR." Appellants' Br. at 33. Thus, the Moriaritys maintain that the "high hazard classification lacked substantial evidence." *Id.* at 37.

[18] Indiana Code Section 14-27-7.5-8(b)(1) states that a "high hazard" dam includes a "structure the failure of which may cause the loss of life and serious damage to homes, industrial and commercial buildings, public utilities, major highways, or railroads." And 312 IAC 10.5-3-1 states in relevant part:

> (a) the division shall assign whether a dam is classified as:
>
> > (1) high hazard;
> >
> > (2) significant hazard; or
> >
> > (3) low hazard;
>
> based on best information available.

(b) In making the determination of assignment under subsection (a), the division shall apply existing U.S. Army Corps of Engineers Phase 1 reports and other appropriate documentation.

(c) *The division may also consider observations of the dam and the vicinity of the dam, including the risk posed to human life and property if the dam fails.*

> (1) If an uncontrolled release of the structure's contents due to a failure of the structure may result in any of the following, the dam shall be considered high hazard:
>
> > (A) The loss of human life.
> >
> > (B) Serious damage to:
> >
> > > (i) homes;
> > >
> > > (ii) industrial and commercial buildings; or
> > >
> > > (iii) public utilities. . . .

(Emphasis added.)[5]

[19]    The Moriaritys' emphasis on Delay's allegedly flawed analysis misses the mark. Other witnesses presented substantial evidence to support the Commission's

---

[5] The Moriaritys note that, while Indiana Code Section 14-27-7.5-8(b) classifies a dam as high hazard when it may cause loss of human life *and* serious property damage, 312 IAC 10.5-3-1 is written in the disjunctive and requires a showing that a dam breach may result in *either* loss of human life or serious property damage. The Moriaritys do not ask us to resolve this apparent inconsistency between the statute and the administrative code.

conclusion that the Moriaritys' dam was a high-hazard dam. In particular, Smith testified that the hazard posed by the dam was obvious and included potential damage to nearby residences. Crosby similarly testified that, if the dam broke, it could cause serious damage to several homes. And Crosby further stated that, "even without the homes," the dam was "still . . . High-Hazard" due to a downstream, "very high-traffic road." Appellee's App. Vol. III at 188. Thus, as the Commission found, "even without Ms. Delay's testimony, there is sufficient evidence to support [the] DNR's conclusion that this is a high hazard dam." Appellants' App. Vol. II at 54. Accordingly, the Moriaritys cannot show that the Commission's decision on this question is contrary to law.

## Issue Three: Final Order

[20] Finally, the Moriaritys contend that the DNR's final order "exceeded the agency's statutory authority because it would effectively require the Moriaritys to dewater their fish pond completely, without the possibility of making modifications that would remove the fish pond from [the] DNR's jurisdiction." Appellants' Br. at 37. However, the Moriaritys raised this issue for the first time in their motion to correct error. As such, the issue is waived. *See Troxel v. Troxel*, 737 N.E.2d 745, 752 (Ind. 2000).

## Conclusion

[21] In sum, we affirm the trial court's denial of the Moriaritys' petition for judicial review.

Affirmed.

Brown, J., and Pyle, J., concur.