


FILED

Jan 03 2019, 2:03 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE

# Indiana Supreme Court

Supreme Court Case No. 18S-PL-00296

## John E. Moriarity and Mae E. Moriarity,
*Appellants (Petitioners below),*

—v—

## Indiana Department of Natural Resources,
*Appellee (Respondent below).*

---

Argued: June 28, 2018 | Decided: January 3, 2019

Appeal from the Grant Circuit Court,
No. 27C01-1511-PL-000073
The Honorable Mark E. Spitzer, Judge

On Petition to Transfer from the Indiana Court of Appeals,
No. 27A04-1612-PL-02731

---

### Opinion by Justice Goff

Chief Justice Rush and Justice David concur.
Justice Massa concurs in result.
Justice Slaughter dissents.

**Goff, Justice.**

The Dam Safety Act gives the Indiana Department of Natural Resources (the "DNR") jurisdiction over certain dams in, on, or along streams in Indiana to protect Hoosiers' lives and property. The Moriaritys have a large pond and related dam on their land, and, since the early 2000s, the DNR has tried to exercise jurisdiction over the dam based on its determination that the dam was located in, on, or along a stream. The Moriaritys have resisted the DNR's jurisdiction and contested its findings without much success in the administrative tribunals and courts below. They now appeal to this Court, presenting us with three different questions. First, did the DNR properly exercise jurisdiction over the dam? Within this question lie issues concerning the reasonableness of the DNR's definition of the word stream and what, if any, notice the Moriaritys had of that definition. Second, did the DNR present substantial evidence supporting its classification of the dam as a high-hazard dam? Third, can the Moriaritys modify their dam to remove it from DNR's future jurisdiction? We answer each of these questions in the affirmative, largely based on our standard of review, and affirm the trial court.

## Factual and Procedural History

In the late 1990s, Mae ("Becky") and John Moriarity decided to build a pond on farm land they owned in Grant County. Before excavating and building the necessary embankments, they contacted various local, state, and federal agencies and obtained what they were told were the necessary permits. By 2000, after a few years of work, the Moriaritys ended up with a fairly large pond and related dam. Their pond covered between thirty and forty acres and contained at least one hundred acre-feet of water, and parts of the dam holding back this water were taller than twenty feet.

By 2002, the DNR was aware of the pond and dam. Throughout the early 2000s, the DNR sought to have the Moriaritys correct what it considered "significant safety deficiencies" in the dam according to Indiana Code chapter 14-27-7.5 (the "Dam Safety Act" or the "Act"). *See* Appellee's App. Vol. V, pp. 237, 239. On May 14, 2012, the DNR issued

Notice of Violation VTS-3933-DM (the "NOV") to the Moriaritys, describing numerous violations of the Dam Safety Act. The NOV ordered the Moriaritys to make certain changes to their pond and dam, imposed $35,000 in civil penalties for past violations, and provided daily penalties for any continuing violations.

The Moriaritys petitioned for administrative review of the NOV. Two administrative law judges held a multi-part fact-finding hearing over the course of several months at which the parties presented argument and evidence. At the hearing, the parties' disputes included whether the Moriaritys' dam fell within the DNR's jurisdiction to regulate dams built in, on, or along streams and, if so, whether the dam was properly classified as a high-hazard dam. After the hearing, the presiding administrative law judge issued her Findings of Fact, Conclusions of Law and Nonfinal Order generally in favor of the DNR.

The Moriaritys objected to the administrative law judge's order, and the Natural Resources Commission (the "NRC") held oral argument. The NRC then issued its Findings of Fact, Conclusions of Law and Final Order (the "Final Order") largely along the same lines as the administrative law judge's nonfinal order.[1] The NRC found that the DNR's use of the common meaning of the word stream was proper and constituted an ascertainable standard for identifying a stream, that the Moriaritys' dam was in, on, or along at least one stream, and that there was sufficient evidence to support the conclusion that the Moriaritys' dam was a high-hazard dam. The NRC ordered the Moriaritys to address the issues with their dam, giving them essentially two options: (1) have a professional engineer help safely lower the water in the pond, inspect the dam, make any necessary repairs to the dam, and refill the pond, or (2) have a professional engineer help "dewater, breach and permanently decommission the dam." *See* Appellants' Corrected App. Vol. 2, pp. 56–57, ¶¶ 1–5. The NRC also ordered the Moriaritys to pay civil penalties

---

[1] In this context, the NRC is the ultimate authority of the DNR. Ind. Code § 14-10-2-3 (2014 Repl.). Thus, the Final Order represented the DNR's last order on the matter.

totaling $10,000 for past violations of the Dam Safety Act without imposing daily penalties for continuing violations. *Id.* at 57, ¶ 6.

The Moriaritys sought judicial review of the Final Order, and the trial court affirmed. It ordered the Moriaritys to take the specific action ordered by the DNR, quoting some paragraphs from the NRC's final order and summarizing others. The Moriaritys filed a motion to correct error, which was later deemed denied.

The Moriaritys then appealed to the Court of Appeals. *Moriarity v. Ind. Dep't of Nat. Res.*, 91 N.E.3d 642 (Ind. Ct. App. 2018). They raised many of the same issues as before the NRC and trial court, and the Court of Appeals affirmed. *Id.* at 646–49. They also challenged the Final Order to the extent that it did not expressly allow them to modify their pond and dam so that it would fall outside DNR's jurisdiction, but the Court of Appeals found this argument waived. *Id.* at 649.

We granted the Moriaritys' petition to transfer, thereby vacating the Court of Appeals opinion. *See* Ind. Appellate Rule 58(A).

## Standard of Review

The Moriaritys challenge the trial court's order upholding the DNR's administrative decision. Under Indiana's Administrative Orders and Procedures Act ("AOPA"), we may set aside an agency's action if it is:

> (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence.

Ind. Code § 4-21.5-5-14(d) (2018). The Moriaritys bear the burden of showing us that the DNR's action is invalid. I.C. § 4-21.5-5-14(a).

With AOPA in mind, we note that "[o]ur review of agency action is intentionally limited, as we recognize an agency has expertise in its field and the public relies on its authority to govern in that area." *Ind. Alcohol*

*and Tobacco Comm'n v. Spirited Sales, LLC*, 79 N.E.3d 371, 375 (Ind. 2017) (quoting *West v. Office of Ind. Sec'y of State*, 54 N.E.3d 349, 352–53 (Ind. 2016)). We do "not try the facts de novo" but rather "defer to the agency's findings if they are supported by substantial evidence." *Id.* "On the other hand, an agency's conclusions of law are ordinarily reviewed de novo." *Id.* While "[w]e are not bound by the [agency's] conclusions of law, . . . '[a]n interpretation of a statute by an administrative agency charged with the duty of enforcing the statute is entitled to great weight, unless this interpretation would be inconsistent with the statute itself.'" *Chrysler Grp., LLC v. Review Bd. of Ind. Dep't of Workforce Dev.*, 960 N.E.2d 118, 123 (Ind. 2012) (third alteration in original) (quoting *LTV Steel Co. v. Griffin*, 730 N.E.2d 1251, 1257 (Ind. 2000)). *See also Nat. Res. Comm'n v. Porter Cty. Drainage Bd.*, 576 N.E.2d 587, 588 (Ind. 1991) (stating that "the interpretation of a statute by the administrative agency charged with its enforcement is entitled to great weight"). "In fact, 'if the agency's interpretation is reasonable, we stop our analysis and need not move forward with any other proposed interpretation.'" *Jay Classroom Teachers Ass'n v. Jay Sch. Corp.*, 55 N.E.3d 813, 816 (Ind. 2016) (citation omitted). Like many cases involving judicial review of agency action, the outcome here turns on this standard of review.

Despite the dissent's resolute arguments to the contrary, applying this standard of review comports with precedent and our prior decision in *NIPSCO Industrial Group v. Northern Indiana Public Service Co.*, 100 N.E.3d 234, 241 (Ind. 2018). Rather than effecting a sea change in *NIPSCO*, we applied a specific, controlling portion of the same standard we recite today. Both in *NIPSCO* and here, we note that we ordinarily review legal questions addressed by an agency de novo. *Id.* In *NIPSCO*, that was our primary focus. *Id.* We did not continue our discussion of the standard of review to address an agency's interpretation of the relevant statute because there was no need; we found the agency's interpretation contrary to the statute itself and, thus, necessarily unreasonable. *Compare id.* at 237–38, 242, *with Jay Classroom Teachers Ass'n*, 55 N.E.3d at 816 (instructing that we accept an agency's interpretation only if it is reasonable), *and Chrysler Grp., LLC*, 960 N.E.2d at 123 (providing that an agency's interpretation that is inconsistent with the statute itself does not receive

"great weight"). Here, on the other hand, we continue our discussion and recite the full standard because in Part I.A. below we find the DNR's interpretation reasonable and not inconsistent with the Dam Safety Act. Differences in the respective agencies' statutory interpretations in *NIPSCO* and here lead us to focus on different parts of the standard of review. In both cases, however, the whole standard remains the same.

Taking a step back from the details of these cases, this standard of review does not abdicate any of our duties, diminish the role of the judiciary, or cast doubt on any rules of statutory construction by implication. This standard entails a fresh look at the dispute on appeal, including the agency's interpretation of the relevant statute, and allows us to continue to say what the law is. It retains for the judiciary the ultimate power to determine the outcome of the dispute based on the law and facts, but it also recognizes the expertise contained within a co-equal branch of government and the value to the public in being able to rely on reasonable agency interpretations. Finally, as was the case in each prior opinion to apply this standard, our use of the standard here does nothing to cast doubt on the continued vitality of the rule of lenity.

# Discussion and Decision

The Dam Safety Act, in relevant part, is concerned with the safety of certain dams[2] in, on, or along streams in Indiana. I.C. § 14-27-7.5-8(a)(1) (2004). It places an affirmative obligation on the owners of such dams to properly maintain them, I.C. § 14-27-7.5-7(a), and it gives the DNR supervisory and enforcement power to ensure this happens, I.C. § 14-27-7.5-8(a)(1)–(2). Here, the DNR asserted jurisdiction over the Moriaritys' dam after concluding it was in, on, or along a stream, it then assigned a hazard classification to the dam based on the assessed risk to nearby people and property, and it finally ordered the Moriaritys to perform

---

[2] The Act speaks in terms of structures, which are defined as dams and their "appurtenant works." I.C. § 14-27-7.5-5 (2004). For ease of discussion, references in this opinion to a dam are meant to include its appurtenant works.

certain inspection and maintenance activities.  The Moriaritys challenge the DNR's jurisdiction, its hazard classification, and its ordered actions. We address each argument in turn.

## I.    The DNR has jurisdiction over the Moriaritys' dam based on its location in, on, or along a stream of Indiana.

The Dam Safety Act gives the DNR jurisdiction over dams "in, on, or along the rivers, streams, and lakes of Indiana."  I.C. § 14-27-7.5-8(a)(1). The DNR's assertion of jurisdiction over the Moriaritys' dam rested primarily on the presence of at least one stream on the property, and so the Moriaritys focus their jurisdictional arguments on the word stream. They argue that the DNR improperly defined the word and that it failed to provide an ascertainable standard of what constitutes a stream.[3]  Both arguments fail.

### A.  The DNR's definition of stream was reasonable.

Neither the legislature nor the DNR have defined the word stream for purposes of the Dam Safety Act, and the Moriaritys argue that the DNR used an improper definition here.  When presented with a question of statutory interpretation, "our primary goal is to ascertain the legislature's intent[,] . . . look[ing] first to the statutory language itself."  *Suggs v. State*, 51 N.E.3d 1190, 1193 (Ind. 2016).  If the legislature has not defined a word, we give the word its plain, ordinary, and usual meaning, consulting

---

[3] To the extent the Moriaritys challenge the factual basis for the finding that their dam was located in, on, or along a stream, their argument fails.  The DNR presented substantial evidence, by way of testimony of at least six witnesses along with photographs, to support its finding that the dam was built in, on, or along a stream.  *See* Appellants' Corrected App. Vol. 2, p. 88 (testimony of Robert Wilkinson); Appellee's App. Vol. II, pp. 85–86, 91–92, 95–107 (testimony of Kenneth Smith referencing photographs); *id.* at 222–25 (testimony of Rodney Neese); Appellee's App. Vol. III, pp. 28–31 (testimony of Jon Eggen); *id.* at 95–96 (testimony of Darrin Miller); *id.* at 169–70 (testimony of George Crosby).

English language dictionaries when helpful in determining that meaning. *State v. Hancock*, 65 N.E.3d 585, 587 (Ind. 2016). But when, as happened here, an agency interprets a statute it is tasked with enforcing, we give the agency's interpretation "great weight" and stop our analysis if that interpretation is reasonable. *West*, 54 N.E.3d at 353 (citation omitted).

Here, the DNR identified a stream as "flowing water through a defined channel" with neither size nor consistency of water flow being determinative of the presence of a stream. Appellants' Corrected App. Vol. 2, pp. 51–52. This definition is consistent with dictionary definitions of the word. *See Stream*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2259 (2002) (defining the word as "a body of running water flowing in a channel on the surface of the ground . . ."). *See also* Appellee's App. Vol. V, pp. 6–10 (providing various definitions of the word). And there is no indication that this definition is inconsistent with the Dam Safety Act itself. Because the definition the DNR used is consistent with the plain, ordinary, and usual meaning of the word stream, it is reasonable, and we "need not move forward with any other proposed interpretation." *Jay Classroom Teachers Ass'n*, 55 N.E.3d at 816 (citation omitted).

## B. The Moriaritys had adequate notice of what constitutes a stream for purposes of the Dam Safety Act.

The Moriaritys contend that they lacked adequate notice that their property contained a stream that could bring their dam within the DNR's Dam Safety Act jurisdiction. Specifically, they claim that the "DNR, by failing to promulgate any regulations or guidance [defining stream under the Act] and relying solely on the statute, had not given any notice or fair warning" that their dam would fall within DNR's jurisdiction. Pet. to Transfer, pp. 7–8. As the Moriaritys correctly point out, "[a]dministrative decisions must . . . be based on ascertainable standards in order to be fair and consistent rather than arbitrary and capricious." *State Bd. of Tax Comm'rs v. New Castle Lodge #147, Loyal Order of Moose, Inc.*, 765 N.E.2d 1257, 1264 (Ind. 2002). These standards "give fair warning as to what the agency will consider in making its decision." *Id.* (citation omitted).

However, this ascertainable standards requirement is not meant to unduly constrain administrative action because agencies are "entitled to reasonable latitude in carrying out [their] responsibilities." *Id.* at 1264 n.13 (citing *State Bd. of Tax Comm'rs v. Garcia*, 766 N.E.2d 341 (Ind. 2002)). The Moriaritys fail to show that the DNR's reliance on the language of the Act, rather than on explanatory regulations or other guidance, failed to provide an ascertainable standard for two reasons.

As an initial matter, an agency is not required to promulgate regulations defining each word in a statute. Although the Moriaritys seem to advocate for this rule, they cite no law foisting such a burden upon agencies in Indiana. To the contrary, we have a well-established rule to deal with these situations: "[u]ndefined words . . . are given their plain, ordinary and usual meaning." *Hancock*, 65 N.E.3d at 587 (citing I.C. § 1-1-4-1(1) (2016 Repl.)). Here, the DNR based its definition of the word stream on the standard dictionary definition, as the legislature and this Court have instructed. This reasonable definition gave the Moriaritys fair warning as to what the DNR would consider a stream. It was neither arbitrary nor capricious.

Additionally, the Moriaritys' intense focus on the word stream and the lack of regulations defining the word loses sight of the legislature's intent in enacting the Dam Safety Act and the Act's other jurisdictional provisions. As the colloquial name of the Act implies, it is all about the safety of dams. *See, e.g.*, I.C. § 14-27-7.5-7(a) (2004). It is not a law regulating streams. While the word stream is one part of the Act's jurisdictional grant, *see* I.C. § 14-27-7.5-8(a)(1), it cannot be viewed in isolation without also considering the broader context of the statutory provision within the Dam Safety Act. In fact, another provision provides specific guidance on dams that fall outside the Act. I.C. § 14-27-7.5-1. Dams that are no more than twenty feet high and that do "not impound a volume of more than one hundred . . . acre-feet of water[,]" among other things, are not within the DNR's Dam Safety Act jurisdiction. I.C. § 14-27-7.5-1(1). When the word stream is viewed in light of the Act's purpose and the other jurisdictional provisions, individuals have more than fair notice of which dams might fall within the DNR's jurisdiction. This conclusion is driven home even more forcefully in this case, where the

Moriaritys stipulated that parts of their dam were taller than twenty feet and that their dam impounded more than one hundred acre-feet of water. Appellee's App. Vol. II, pp. 48–49. The Moriaritys have failed to show that the DNR's exercise of jurisdiction over their dam based on the statutory language of the Dam Safety Act was arbitrary or capricious.

## II. The DNR presented substantial evidence supporting its classification of the Moriaritys' dam as a high-hazard dam.

As part of its supervisory duties under the Dam Safety Act, the DNR must assign a hazard classification—high, significant, or low—to each dam within its jurisdiction based on the risk posed to life and property in the event of an uncontrolled release from the dam. I.C. § 14-27-7.5-8(b). The DNR classified the Moriaritys' dam as high-hazard, and the Moriaritys argue on appeal that this classification lacks substantial evidence. While the Moriaritys acknowledge that two DNR witnesses testified that the dam was a high-hazard structure, they argue that an inundation study the DNR completed was so flawed that the DNR's conclusion on the dam's hazard classification was not supported by substantial evidence.

When reviewing a claim that an agency's decision lacks substantial evidence, "the reviewing court may vacate [the] decision only if the evidence, when viewed as a whole, demonstrates that the conclusions reached by the [agency] are clearly erroneous." *Regester v. Ind. State Bd. of Nursing*, 703 N.E.2d 147, 151 (Ind. 1998) (citation omitted). "A judgment is clearly erroneous when there is no evidence supporting the findings or the findings fail to support the judgment." *E.B.F. v. D.F.*, 93 N.E.3d 759, 762 (Ind. 2018).

The Dam Safety Act defines a high-hazard dam as "[a] structure the failure of which may cause the loss of life and serious damage to homes, industrial and commercial buildings, public utilities, major highways, or

railroads." I.C. 14-27-7.5-8(b)(1).[4] The Act's regulations instruct the DNR's Division of Water to assign its hazard classifications "based on [the] best information available" and expressly allow it to "consider observations of the dam and the vicinity of the dam, including the risk posed to human life and property if the dam fails." 312 Ind. Admin. Code 10.5-3-1(a), (c) (2012), http://www.in.gov/legislative/iac/T03120/A00105.PDF?&iacv=iac2012. To support its high-hazard assessment, the DNR presented testimony of two of its employees as well as an inundation study conducted on the dam. On the other hand, the Moriaritys presented testimony casting doubt on the accuracy of the inundation study. Even ignoring the evidence from the inundation study, the DNR presented substantial evidence supporting the dam's high-hazard classification. Kenneth Smith, the Assistant Director of DNR's Division of Water, testified that the presence of a church, a home, and a road below the dam made it "visually obvious" that it would likely be a high-hazard dam. Appellants' Corrected App. Vol. 2, pp. 128–29. George Crosby, the Manager of DNR's Dam Safety Section, testified that, if the dam broke above the house situated below the dam, it would cause "serious damage." Appellants' Corrected App. Vol. 3, p. 45. He also testified that the dam would be classified as high-hazard even without the homes below because the road below the dam was heavily trafficked. Appellee's App. Vol. III, p. 187–88. Thus, substantial evidence supports the DNR's conclusion that the Moriaritys' dam was a high-hazard structure. The Moriaritys' argument to the contrary fails.

---

[4] We note that the standards for classifying a dam as high-hazard are not the same in the Indiana Code and the Indiana Administrative Code. *Compare* I.C. § 14-27-7.5-8(b)(1) (allowing such a classification when a dam's failure can result in loss of life **and** serious damage to property) *with* 312 Ind. Admin. Code 10.5-3-1(c)(1) (2012), http://www.in.gov/legislative/iac/T03120/A00105.PDF?&iacv=iac2012 (allowing such a classification when a dam's failure can, among other things, result in loss of life **or** serious damage to property). The parties do not ask us to resolve this apparent inconsistency.

# III. The Moriaritys may, in the course of complying with the trial court's order, modify their dam to remove it from DNR's jurisdiction.

The Moriaritys insist that the DNR exceeded its jurisdiction by issuing its Final Order that did not expressly allow them to modify their dam to remove it from the DNR's jurisdiction. They seek a modification of the trial court's order enforcing the Final Order to include an express provision allowing them to change their dam so that it no longer falls within the DNR's Dam Safety Act jurisdiction, or they ask us to remand with instructions that they may change their dam to remove it from the DNR's jurisdiction. Regardless of any potential waiver of this argument due to the Moriaritys' failure to raise it before their motion to correct error, we will address it. *See Pierce v. State*, 29 N.E.3d 1258, 1267 (Ind. 2015) (citation omitted) ("[W]henever possible, 'we prefer to resolve cases on the merits' instead of on procedural grounds like waiver.").

The trial court's order largely adopted the portions of the DNR's Final Order regarding compliance with the Dam Safety Act going forward. Appellants' Corrected App. Vol. 2, pp. 25–26. Modification of this order is not necessary, but the Moriaritys may choose to modify their dam in the course of complying with the trial court's order in order to remove it from the DNR's jurisdiction from that point forward. As noted above, the Moriaritys stipulated that their dam exceeded twenty feet in height and impounded a volume of more than one hundred acre-feet of water, both of which meant their dam did not qualify for the Dam Safety Act's statutory exception. *See* I.C. § 14-27-7.5-1(1) (2004). If they modify it so that it no longer exceeds a height of twenty feet or impounds more than one hundred acre-feet of water (along with the other statutory requirements), the DNR will no longer have jurisdiction over the dam under the Dam Safety Act.[5] The DNR acknowledged that this option was

---

[5] Since the trial court's order affirming the Final Order contemplated actions taken under the supervision or direction of a professional engineer, any modification would necessarily also involve a professional engineer's oversight.

available to the Moriaritys, Oral Argument at 20:58–22:50, and the Moriaritys acknowledged that they would accept this option, *id.* at 17:05–17:20, 18:19–18:58. Whether the parties ultimately act on this apparent agreement is up to them.[6]

# Conclusion

For the reasons stated herein, we affirm the trial court's order enforcing the Final Order. We find, however, that the Moriaritys can, in the course of complying with the trial court's order, modify their dam to remove it from the DNR's jurisdiction under the Dam Safety Act. Given the parties' unsuccessful attempts at settlement despite their apparent agreement in principle, we anticipate disagreements may arise if the Moriaritys choose to modify their dam to remove it from the DNR's jurisdiction. Because those disagreements have only been hinted at and not fully litigated to date, we cannot offer guidance on them but instead leave that to the trial court, should the need arise. *See State ex rel. Brubaker v. Pritchard*, 236 Ind. 222, 226, 138 N.E.2d 233, 235 (Ind. 1956) ("It is well established that once a court acquires jurisdiction over parties, the jurisdiction continues until the final disposition of the litigation including the enforcement of the judgment or decree."). Therefore, we remand to the trial court for further proceedings consistent with this decision.

---

[6] With the appeal before us resolved, we pause now to comment on a broader issue implicated by this dispute. Although the DNR has largely won here, it likely could have avoided this protracted litigation in the first place by defining the word stream for purposes of the Dam Safety Act. It clearly knows how to define words for the Act, *see* 312 Ind. Admin. Code 1-1-21(a) (2018), http://www.in.gov/legislative/iac/T03120/A00010.PDF?&iacv=iac2018 (defining lake), and, as this case demonstrates, DNR employees have a shared understanding of the word stream. Defining the word would presumably reduce the complexity of enforcement actions and increase public confidence in the agency's decisions.

Rush, C.J., and David, J., concur.

Massa, J., concurs in result.

Slaughter, J., dissents with separate opinion.

**Slaughter, J., dissenting.**

I respectfully dissent from the Court's decision for two reasons. **First**, on the standard of review, I would give no deference to the Department's interpretation of "stream" within the Dam Safety Act. The prerogative to interpret the law authoritatively belongs to us. And we disserve separation-of-powers principles when we allow agencies within the executive branch to usurp a core judicial function. **Second**, on the merits, the Court's conclusion that the Department properly exercised jurisdiction over the Moriaritys' property follows from the Court's deferential standard of review. Its application of the wrong standard has caused it to reach the wrong result.

I'll begin with the standard of review. Just this year, we held unanimously that we review agencies' legal determinations "de novo"; that we accord such determinations "no deference"; that plenary review of agency decisions is "constitutionally preserved" for the judiciary; that our separation-of-powers doctrine does not contemplate a "tie-goes-to-the-agency" standard for reviewing agency decisions on questions of law; and that we decide the statutory interpretation that is "best" and "do not acquiesce in the interpretations of others." *NIPSCO Indus. Grp. v. Northern Indiana Pub. Serv. Co.*, 100 N.E.3d 234, 241 (Ind. 2018).

In contrast, the Court today applies a very different standard. It opens by describing the standard as "de novo" but then says the interpretation of a statute by the agency charged with enforcing it is entitled to "great weight"; and that an agency's interpretation need only be "reasonable", at which point we will "stop our analysis" and not consider "any other proposed interpretation."

I had thought this discredited standard, which the Court resurrects today, had been laid to rest for good in *NIPSCO*. What we held in *NIPSCO* cannot be reconciled with the standard the Court applies today. It is no answer that *NIPSCO* involved the Utility Regulatory Commission and today's decision concerns the Department of Natural Resources. There is no principled reason, consistent with separation of powers, for according fundamentally different treatment to the statutory interpretations of different agencies within the executive branch of state government. An

agency interpretation that is "reasonable" but not the "best" is not good enough. Allowing an agency's **reasonable** interpretation to prevail over our **best** interpretation ignores our unique "law-giving function", *A.A. v. Eskenazi Health/Midtown CHMC*, 97 N.E.3d 606, 610 n.1 (Ind. 2018), which includes our inherent constitutional "duty to act as the final and ultimate authority" in pronouncing Indiana law, *id*. (quoting *Troue v. Marker*, 253 Ind. 284, 288, 252 N.E.2d 800, 803 (1969)).

These rival standards of review—"only the best" vs. "reasonable will do"—are not only irreconcilable but proceed from very different visions of the role of the judiciary within our constitutional scheme. *NIPSCO* regards the judiciary as a vital, co-equal branch within our tripartite system of government with ultimate responsibility for interpreting the law. Today's decision, however, treats the judiciary as a bit player with a limited role vis-à-vis the other two branches. To be sure, judicial modesty has its place. But we should not confuse modesty with abdication. Our job is to interpret the law fully and faithfully—no more, no less. Today's standard does much less. It is a standard where judicial review is plenary in theory, deferential in name, and a rubberstamp in fact.

We do not give similar deference to other actors who wield executive power. For example, we afford zero deference to prosecuting attorneys, who exercise an essential aspect of the State's executive power: the power "to enforce the criminal laws of the State of Indiana". *State ex rel. Egan v. Superior Ct. of Lake Cty.*, 211 Ind. 303, 309, 6 N.E.2d 945, 947 (1937). Prosecutors would seemingly have greater standing to insist on deference when interpreting the laws they enforce. Unlike executive-branch agencies, prosecutors are not creatures of statute but **constitutional** officers. Ind. Const. art. 7, § 16. As between them, one might think that if deference were ever appropriate on matters of legal interpretation, it would be constitutional officers who deserve the benefit of the doubt. But our caselaw holds otherwise. If a criminal statute is ambiguous, we do not give "great weight" to a prosecutor's interpretation or require that the interpretation only be "reasonable" to withstand legal challenge. To the contrary, our rule of lenity holds that ambiguity in a statute defining a crime should be resolved in favor of the defendant. *Day v. State*, 57 N.E.3d 809, 813 (Ind. 2016). Make no mistake—that is how it should be. But given

the standard of review the Court applies today, one might fairly ask whether the rule of lenity's continued validity is now in doubt. I hope the answer is no, but I am not confident of that. At a minimum, today's standard erodes the rule's doctrinal underpinnings.

Turning to the merits, the conclusion that the Department properly exercised jurisdiction under the Dam Safety Act is premised on the Court's acquiescence in the Department's determination that the disputed dam was located along a "stream". As the Court acknowledges, its lax standard of review ensured the Department's jurisdictional ruling would be upheld: "Like many cases involving judicial review of agency action, the outcome here turns on this standard of review." On this point, I agree with the Court. A more robust standard would have led to a different outcome on the threshold question of the Department's exercise of jurisdiction over the Moriaritys' property. Because the Court applied the wrong standard, it reached the wrong result.

I respectfully dissent.

ATTORNEY FOR APPELLANTS
William M. Horne
Horne Law LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Curtis T. Hill, Jr.
Attorney General of Indiana

Patricia C. McMath
Deputy Attorney General
Indianapolis, Indiana