

FILED

Oct 30 2023, 9:03 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Donald R. Shuler
Barkes, Kolbus, Rife & Shuler, LLP
Goshen, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Alexandria Sons
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| James A. Cassity,<br>*Appellant-Defendant*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | October 30, 2023<br><br>Court of Appeals Case No.<br>23A-CR-209<br><br>Appeal from the Elkhart Superior<br>Court<br><br>The Honorable Gretchen S. Lund,<br>Judge<br>The Honorable Eric S. Ditton,<br>Magistrate<br><br>Trial Court Cause No.<br>20D04-2001-F6-92 |

**Opinion by Judge Pyle**

Judges Vaidik and Mathias concur.

**Pyle, Judge.**

## Statement of the Case

[1] James A. Cassity ("Cassity") appeals his convictions, following a bench trial, for Level 6 felony possession of methamphetamine[1] and Class A misdemeanor possession of paraphernalia.[2] Cassity argues that the trial court abused its discretion when it admitted the methamphetamine and paraphernalia into evidence because the arresting officer was not wearing a distinctive uniform as required by INDIANA CODE § 9-30-2-2 ("the Police Uniform Statute"). Concluding that the trial court abused its discretion, we reverse the trial court's judgment.

[2] We reverse.

## Issue

> Whether the trial court abused its discretion when it admitted evidence.

## Facts

[3] In January 2020, Elkhart City Police Department Officer Justin Gage ("Officer Gage") was working as a member of the community relations unit. Officer Gage, who was driving an unmarked police car, was parked across the street from hotels that were being watched for drug activity. Cassity was the driver of a white Buick ("Cassity's car"). While watching the hotel, Officer Gage saw,

---

[1] IND. CODE § 35-48-4-6.1.

[2] I.C. § 35-48-4-8.3.

on two separate occasions, Cassity fail to signal while turning. Officer Gage then initiated a traffic stop on Cassity's car. At the time of the traffic stop, Officer Gage was wearing a sweatshirt and jeans, and he wore a vest over his clothing. The vest contained the word "POLICE" written on it and had a badge on the shoulder area of the vest. On his vest, Officer Gage also carried his firearm, a taser, a bodycam, a radio, a notepad, and a pen.

[4] Officer Gage approached Cassity's car from the passenger side. When Officer Gage was walking up to the vehicle, he observed a woman later identified as Nicole Doty ("Doty") making furtive movements and frantically placing something behind the center console. Additionally, when Officer Gage began talking with Doty and Cassity, he noticed that both Cassity and Doty were "visibly nervous[.]" (Tr. Vol. 2 at 202). Officer Gage also noticed that Doty was "shaking" and was reaching underneath her left thigh. (Tr. Vol. 2 at 202). Officer Gage asked both Cassity and Doty to exit Cassity's car. At the same time, Elkhart City Police Officer Gruber ("Officer Gruber"), arrived on the scene wearing clothing similar to Officer Gage's. This clothing included a sweatshirt, jeans, and a vest with the word "POLICE" written across it. Officer Gage saw a baggy containing what he believed to be methamphetamine in the front passenger seat when Doty exited the car, and he watched Cassity glance behind the center console as he exited the car.

[5] After Cassity and Doty had both exited Cassity's car, Officer Gage and Officer Gruber handcuffed them. Around this point in time, two officers driving marked police cars arrived at the scene. Officer Gage searched Cassity's car for

drugs and found a zipped bag behind the center console. The zipped bag contained methamphetamine. Officer Gage also searched Cassity and found on his person a baggy of methamphetamine along with a pipe containing burnt residue.

[6] The State charged Cassity with Level 6 felony possession of methamphetamine and Class A misdemeanor possession of paraphernalia for the methamphetamine and pipe that Officer Gage found on his person. Thereafter, Cassity filed a motion to suppress the methamphetamine and paraphernalia found on his person during the traffic stop. In September 2022, the trial court held a suppression hearing. At this hearing, Cassity argued that Officer Gage did not have the authority to stop him under the Police Uniform Statute. Officer Gage testified at the hearing and specifically testified that he had been wearing a "modified police uniform" with the word police across the vest and his badge affixed to the outer vest area. (Tr. Vol. 2 at 111). Officer Gage also testified that, at the time of the stop, he had been driving an unmarked police car. Officer Gage further testified that Cassity and Doty were not free to leave after he had initiated the traffic stop. During closing arguments, Cassity argued that Officer Gage did not have the authority under the Police Uniform Statute to make the traffic stop because he was in an unmarked police car and was not dressed in a distinctive police uniform. In support of this argument, Cassity cited to *Davis v. State*, 858 N.E.2d 168 (Ind. Ct. App. 2006).

[7] The trial court denied Cassity's motion to suppress. The trial court stated that "Officer Gage was wearing police attire that was sufficiently distinctive enough

that did clearly show to casual observations that he was a police officer[.]" (App. Vol. 2 at 88). The trial court specifically noted that "the word POLICE [was] largely displayed in bright white, capital, shiny letters in the center of the vest[.]" (App. Vol. 2 at 88) (internal quotation marks omitted). The trial court also explained that "there [were] various accoutrements common to police uniforms, e.g. a taser, a firearm, a flashlight, a pen, a notepad, a handheld radio transponder with spiral cord . . ., and a camera lens for the body cam" affixed to the vest. (App. Vol. 2 at 88) (internal quotation marks omitted). Finally, the trial court noted that Officer Gage had an Elkhart Police badge on his shoulder.

[8] The trial court held a jury trial in October 2022. The jury heard the facts as set forth above. Additionally, at the start of Officer Gage's testimony, Cassity lodged a continuing objection to Officer Gage's authority to effectuate the traffic stop and to the admission of the evidence found during the stop. Specifically, Cassity stated that "the officer . . . didn't have the authority under Indiana Code 9-30-2-2, to (indiscernible) stop." (Tr. Vol. 2 at 199). The trial court noted Cassity's ongoing objection.

[9] At the conclusion of the jury trial, the jury found Cassity guilty of Level 6 felony possession of methamphetamine and Class A misdemeanor possession of paraphernalia. At his sentencing hearing, the trial court ordered that Cassity serve two (2) years for his Level 6 felony possession of methamphetamine conviction and one (1) year for his Class A misdemeanor possession of paraphernalia conviction. The trial court ordered Cassity's sentences to be served concurrently at the county jail.

[10]     Cassity now appeals.

## Decision

[11]     Cassity argues that the trial court abused its discretion when it admitted the methamphetamine and paraphernalia into evidence. Although Cassity originally challenged the admission of the evidence through a motion to suppress, he now challenges the admission of the evidence at trial. Thus, the issue is appropriately framed as whether the trial court abused its discretion by admitting the evidence. *See Jefferson v. State*, 891 N.E.2d 77, 80 (Ind. Ct. App. 2008), *trans. denied*. We will reverse a ruling on the admission of evidence for an abuse of discretion, which occurs only when the ruling is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013).

[12]     Specifically, Cassity argues that the traffic stop initiated by Officer Gage did not satisfy the requirements of INDIANA CODE § 9-30-2-2 because Officer Gage was not wearing a distinctive uniform and badge. INDIANA CODE § 9-30-2-2(a) provides that:

> a law enforcement officer may not arrest or issue a traffic information and summons to a person for a violation of an Indiana law regulating the use and operation of a motor vehicle on a highway or an ordinance of a city or town regulating the use and operation of a motor vehicle on a highway unless at the time of the arrest the officer is:
>
> > (1) wearing a distinctive uniform and a badge of authority; or

> (2) operating a motor vehicle that is clearly marked as a police vehicle;
>
> that will clearly show the officer or the officer's vehicle to casual observations to be an officer or a police vehicle.

A law enforcement officer's compliance with this statute is not optional, it is required. "'The purpose of this statute is to protect drivers from police impersonators and to protect officers from resistance should they not be recognized as officers.'" *Porter v. State*, 985 N.E.2d 348, 355 (Ind. Ct. App. 2013) (quoting *Ervin v. State*, 968 N.E.2d 315, 318 (Ind. Ct. App. 2012)). "The statute seeks to help distinguish law enforcement officers from those on our highways who, for illicit purposes, impersonate law enforcement officers." *Id.* (internal quotation marks and citations omitted). Evidence obtained in an unlawful arrest may be excluded upon proper motion by the defendant. *Id.*

[13] We first turn our attention to whether the Police Uniform Statute applies to Officer Gage's traffic stop. In *Bovie v. State*, 760 N.E.2d 1195 (Ind. Ct. App. 2002), this Court recognized, for purposes of the Police Uniform Statute, that the risks inherent with an investigatory stop are identical to those inherent to an arrest. We further explained that the purpose of the Police Uniform Statute – "to protect drivers from police impersonators and to protect officers from resistance should they not be recognized as officers" – was "implicit in the language" of the statute. *Bovie*, 760 N.E.2d at 1199. Thus, we held that, for purposes of the Police Uniform Statute, "there is no difference between an actual arrest or an investigatory stop." *Id.* Thus, as soon as Officer Gage

initiated the traffic stop on Cassity's car, the Police Uniform Statute applied. *See id.* (holding that an officer neither wearing a uniform nor driving a marked car could not properly conduct a stop based on a traffic violation); *see also Davis v. State*, 858 N.E.2d 168, 172 (Ind. Ct. App. 2006) (holding that the officer "was precluded from conducting a traffic stop and effectuating either an arrest or simply an investigatory stop based on his lack of uniform and marked police vehicle").

[14] We recognize that our legislature did not define the term "distinctive uniform" in the Police Uniform Statute. "If the legislature has not defined a word, we give the word its plain, ordinary and usual meaning, consulting English language dictionaries when helpful in determining that meaning." *Moriarity v. Ind. Dept. of Nat. Res.,* 113 N.E.3d 614, 621 (Ind. 2019). From its earliest uses from Old French and Latin, the word "distinctive" has been used as an adjective describing a noun as being in a different division or class. OXFORD DICTIONARY OF ENGLISH ETYMOLOGY 277 (1966). Originating from Middle French and Latin, the noun "uniform" means "distinctive clothes worn by members of [a] group . . . ." THE BARNHART CONCISE DICTIONARY OF ETYMOLOGY 213 (1995). In addition, we consider how the word "uniform" has been used in statutes regulating police uniforms. *See* INDIANA CODE § 10-11-2-18 (Indiana State Police required to file description or picture of the design, color, insignia, and hat relating to its uniform); I.C. § 10-11-2-17 (uniforms and equipment provided to Indiana State Police officers remain the property of the state); I.C. § 21-17-5-2 (trustees of educational institutions may

prescribe distinctive police uniforms to be worn on campuses); I.C. § 36-8-10-10.6 (special deputies shall wear a uniform the design and color of which is easily distinguishable from the uniforms of the Indiana State Police, the regular county police force, and all municipal police and fire forces located in the county); I.C. § 36-8-10-20.1 (a uniform commission is created and directed to establish a police uniform of standard design and color for sheriffs and their deputies); I.C. § 36-8-4-4 (uniforms provided by a city remain the property of the city); I.C. § 36-8-10-4 (a county police force is established in each county and the county is to provide officers with uniforms).

[15] These statutes direct the State Police, county sheriff, municipalities, and police forces of educational institutions to design distinctive uniforms that set their respective officers apart from each other by color and design. Furthermore, these uniforms remain the property of the respective departments. It is not the accoutrements that make the uniform. Instead, a "distinctive uniform" is the specific design, color, and patches officially adopted by the governmental authority employing the police officer so as to inform the public that the person stopping them is, in fact, a police officer employed by that respective department.

[16] Our holding in this case is bolstered by our decision in *Davis*. In *Davis*, an officer who was a member of a Neighborhood Resource Officer Unit was monitoring a gas station that was in a high drug activity area. The officer was sitting in an unmarked police car across the street from the gas station and initiated a traffic stop on a car for failing to use his turn signal. The officer was

wearing a sweatshirt and jeans underneath a vest with the word "POLICE" written across it and a badge on his shoulder area. We held that an officer wearing a "dark hooded sweatshirt, jeans, and a vest that said POLICE in plain white letters" along with a badge on his shoulder was not a uniform that satisfies the requirements of the Police Uniform Statute, precluding the officer from conducting a traffic stop or effectuating an arrest. *Davis*, 858 N.E.2d at 172.

[17] Here, the facts of this case are similar to *Davis.* Our review of the record reveals that Officer Gage, a member of the community relations unit, was parked in an unmarked car across the street from a hotel known for drug activity. Officer Gage initiated a traffic stop on Cassity's car for failing to use his turn signal. During this evening traffic stop, Officer Gage was wearing a black sweatshirt and jeans. Over his civilian clothes, Officer Gage wore a black vest with the word "POLICE" written in white letters on his chest. Officer Gage also had a taser, a firearm, a flashlight, a pen, a notepad, a handheld radio transponder, and a body cam affixed to his vest. Additionally, Officer Gage had an Elkhart Police badge affixed to his shoulder. However, the officer wore the vest over his civilian clothes and not over a police uniform. As we did in *Davis*, we again hold that a black vest with the word police written across it, worn over civilian clothes, does not satisfy the distinctive uniform requirement of the Police Uniform Statute. *See Davis*, 858 N.E.2d at 172 (holding that a vest merely stating police, but not bearing the officer's name, police department, or any

other logo or distinguishing feature is not a uniform under the Police Uniform Statute).

[18] The State argues that Officer Gage's clothing satisfied the Police Uniform Statute because he was wearing a vest that contained "all of the various accoutrements common to police uniforms[.]" (State's Br. 10). The State argues that these accoutrements make the vest a "distinctive uniform" as required by the Police Uniform Statute. However, the State cites to no authority supporting this argument, and we are not convinced by such an argument. None of the accoutrements cited by the State are items that are exclusively purchased or possessed by police officers. An individual in possession of a taser, a firearm, a flashlight, a pen, a notepad, a handheld radio transponder, and a body cam worn on a plain vest with the word "POLICE" written on it is not dressed in a "distinctive uniform," as required by the Police Uniform Statute. In addition, the presence of the accoutrements on Officer Gage's vest did not transform his civilian clothes into a "distinctive uniform." This is certainly true in the context of an officer driving an unmarked car at night and wearing civilian clothing, including a sweatshirt and jeans, beneath the vest. Further, none of the accoutrements affixed to Officer Gage's vest clearly identified him as an Elkhart police officer except his badge, which is a separate requirement of the Police Uniform Statute. *See* I.C. § 9-30-2-2(a)(1) (requiring officers to be wearing a distinctive uniform *and* a badge of authority).

[19] Accordingly, we hold that the vest worn by Officer Gage does not satisfy the "distinctive uniform" requirement in the Police Uniform Statute. As a result,

the trial court abused its discretion when it admitted the methamphetamine and paraphernalia obtained as a result of this invalid traffic stop.

[20]    Reversed.

Vaidik, J., and Mathias, J., concur.