

FILED

Dec 19 2024, 2:05 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



I N   T H E

# Indiana Supreme Court

Supreme Court Case No. 23S-EX-162

## Indiana Office of Utility Consumer Counselor; Duke Industrial Group; Nucor Steel–Indiana; Citizens Action Coalition of Indiana, Inc.,

*Appellants,*

–v–

## Duke Energy Indiana, LLC; Indiana Utility Regulatory Commission,

*Appellees.*

---

Argued: September 28, 2023 | Decided: December 19, 2024

Appeal from the Indiana Utility Regulatory Commission
Cause No. 45647

On Petition to Transfer from the Indiana Court of Appeals
Case No. 22A-EX-1685

---

**Opinion by Justice Slaughter**

Justices Massa and Molter concur.

Chief Justice Rush concurs in the judgment.

Justice Molter concurs with separate opinion in which Chief Justice Rush joins.

Justice Goff concurs in the judgment with separate opinion.

**Slaughter, Justice.**

This case involves regulatory approval of a public utility's proposed infrastructure improvements under the TDSIC statute—the transmission, distribution, and storage improvement statute, Ind. Code ch. 8-1-39. This statute permits utilities to recoup the costs of approved infrastructure improvements as they are completed. The Indiana Utility Regulatory Commission found the TDSIC plan at issue here to be reasonable and approved all its proposed improvements. On appeal, the parties offer two rival interpretations of the statute's cost-justification section: whether each improvement in the plan must be cost-justified, or whether all improvements combined must be cost-justified. The commission says its order approving the plan was based on the latter interpretation. The court of appeals, on judicial review, found this interpretation "reasonable" and applied a deferential standard of review to the commission's order approving the plan.

We hold, first, that the scope of commission authority to approve a TDSIC plan is a question of law, and that the panel erred in relying on *Moriarity v. Indiana Department of Natural Resources*, 113 N.E.3d 614 (Ind. 2019), for its conclusion that a reviewing court's statutory interpretation begins and ends with agency deference. Rather than deferring to the commission, we conduct a plenary review and hold, second, that the commission needed to include in its order a determination whether each of the plan's improvements is cost-justified. On this record, the commission made the required determination, so we affirm.

I

A

Under traditional ratemaking, public utilities must first make improvements to their infrastructure before they can recover their costs through commission-approved rate increases to customers. *NIPSCO Indus. Grp. v. N. Ind. Pub. Serv. Co.*, 100 N.E.3d 234, 236 (Ind. 2018), modified on reh'g. The process for recouping these costs, sometimes not until years after they were incurred, is an expensive, onerous rate case, which involves a comprehensive, after-the-fact review of a utility's entire business operations.

*Ibid.* In setting rates, the commission has broad authority to exclude expenditures it deems unnecessary or excessive. I.C. § 8-1-2-48(a).

Unlike traditional ratemaking, the legislature through the TDSIC statute allows the commission to approve future expenses, 80 percent of which the utility may then recover through periodic rate increases as it incurs these expenses. *Id.* § 8-1-39-9(a); *NIPSCO Indus. Grp.*, 100 N.E.3d at 236–37, 239. The remaining 20 percent must be secured through an ordinary rate case. I.C. § 8-1-39-9(c). If the commission approves a TDSIC plan, the utility can periodically raise its rates automatically as it completes authorized improvements. *Id.* § 8-1-39-9(a). Under the TDSIC statute, a utility may request approval of a five-to-seven-year plan for eligible transmission, distribution, and storage improvements. *Id.* §§ 8-1-39-7.8, -10(a). When seeking approval of a plan, a utility may also seek approval of targeted economic-development projects. *Id.* § 8-1-39-10(a).

The commission must approve a utility's proposed TDSIC plan if it determines the plan is reasonable:

> If the commission determines that the public utility's TDSIC plan is reasonable, the commission shall approve the plan and authorize TDSIC treatment for the eligible transmission, distribution, and storage improvements included in the plan.

*Id.* § 8-1-39-10(b). En route to deciding a plan's reasonableness, the commission through its order must make one finding and two determinations:

> The order must include the following:
>
> (1) A finding of the best estimate of the cost of the eligible improvements included in the plan.
>
> (2) A determination whether public convenience and necessity require or will require the eligible improvements included in the plan.
>
> (3) A determination whether the estimated costs of the eligible improvements included in the plan are justified by incremental benefits attributable to the plan.

*Ibid.* At issue here is the section 10(b)(3) determination: "whether the estimated costs of the eligible improvements included in the plan are justified by incremental benefits attributable to the plan." *Id*. § 8-1-39-10(b)(3).

B

In 2021, Duke Energy Indiana, LLC, submitted a six-year TDSIC plan for commission approval. Duke's proposed plan costs $2.14 billion. Duke wants to (1) improve its system's reliability; (2) enhance the electrical grid's resistance to physical damage and ability to recover from adverse events; (3) expand renewable energy and distributed generation, which refers to generating electricity near where it will be used; and (4) bolster economic development. The Indiana Office of Utility Consumer Counselor, Duke Industrial Group, Citizens Action Coalition of Indiana, Inc., and Nucor Steel–Indiana intervened at the commission and opposed Duke's plan.

Before the commission, the parties disputed whether the estimated costs of the eligible improvements included in the plan were "justified by incremental benefits attributable to the plan" under section 10(b)(3). Duke presented evidence that the plan will reduce the frequency of customer outages by 17 percent and their duration by 19 percent. Duke also worked with a consulting firm to quantify the value of each project and compute a benefit-to-cost ratio. Projects with a benefit-to-cost ratio above 1.0, or a positive return, have quantifiable benefits that outweigh the estimated costs. Projects with a ratio below 1.0, or a negative return, have costs that outweigh the benefits. Duke's plan scored 2.8 overall with contingent expenses excluded and 2.4 overall with contingent expenses included, while increasing customers' utility rates by one percent or less.

The industrial group objected, saying that Duke wants to pass on to utility customers the costs of some individual projects that are not justified by their corresponding benefits. While the benefit-to-cost ratio for Duke's whole plan is well above 1.0, the ratios for the plan's individual projects are mixed. For example, upgrading outdated four-kilovolt lines to twelve kilovolts has a 0.6 ratio because the upgrades cost $67 million and yield only $41 million in benefits. Depending on whether contingent expenses are included, between 57 and 90 individual projects, according to the

industrial group, have a benefit-to-cost ratio less than 1.0—meaning they are not cost-justified.

In response, Duke claims even its negative-return upgrades are necessary because modern, self-optimizing grid systems help avoid outages and better accommodate distributed energy generation. And Duke included at least two net-negative projects in the plan because they will affect critical customers. According to Duke, it can include these necessary individual improvements in its TDSIC plan because the plan overall is cost-justified.

The commission approved the plan and found that, under section 10(b)(3), the estimated improvements' costs "are justified by the incremental benefits attributable to [the TDSIC plan]." It noted that the whole plan—all projects combined—has a positive benefit-to-cost ratio, and Duke's analysis did not quantify all project benefits, meaning the benefits side of the ledger is understated. For example, Duke chose 57 projects without relying on a quantitative analysis, the commission found, "because they impact critical customers, such as hospitals and schools, and enhance the grid with other benefits that were not quantified in the [benefit-to-cost ratio] [a]nalysis." Thus, the commission concluded, Duke's plan is reasonable.

The consumer counselor appealed, and the industrial group joined the appeal. The consumer counselor, industrial group, Citizens Action Coalition, and Nucor Steel are all parties to the appeal, Ind. Appellate Rule 17(A), but only the industrial group litigated the appeal. The industrial group filed an appellate brief that no other appellant signed. And no other appellant filed its own brief. On appeal, the industrial group challenged the commission's approval of Duke's plan. Specifically, the industrial group argued that Duke's plan did not satisfy section 10(b)(3) because the estimated costs of each improvement in the plan were not justified by the incremental benefits attributable to the plan. In response, Duke and the commission argued the plan meets section 10(b)(3) because the whole plan is cost-justified, and thus the commission was entitled to approve the plan. The industrial group also challenged the commission's decision to allow Duke to recover carrying costs on the deferred operating and

maintenance costs under Indiana Code section 8-1-39-9(c). And it challenged the commission's failure to include specific findings in its order.

The court of appeals affirmed in a precedential opinion. *Ind. Off. of Util. Consumer Couns. v. Duke Energy Ind., LLC*, 205 N.E.3d 1026 (Ind. Ct. App. 2023). It found the commission's statutory interpretations to be reasonable and thus "entitled to deference". *Id.* at 1038, 1040 (citing *Moriarity*, 113 N.E.3d at 619). "[A]s such", the panel continued, "we 'stop our analysis and need not move forward with any other proposed interpretation.'" *Ibid.* (quoting *Moriarity*, 113 N.E.3d at 619). And the panel held that the commission did not commit reversible error in "failing to make findings that explicitly reject each of [the industrial group's] arguments" before the commission. *Id.* at 1041.

The industrial group then sought transfer, which we granted, 211 N.E.3d 1004 (Ind. 2023), thus vacating the appellate opinion, App. R. 58(A).

II

First, we address the applicable standard of judicial review for the commission's legal conclusions. What standard applies has been the subject of much debate because two recent cases from our Court point in different directions on the issue of judicial deference for questions of law. Compare *Ind. Off. of Util. Consumer Couns. v. S. Ind. Gas & Elec. Co.*, 200 N.E.3d 915, 919 (Ind. 2023) ("*SIGECO*") (according no deference to commission's legal conclusions), with *Moriarity*, 113 N.E.3d at 621 (giving deference to agency's reasonable statutory interpretations). We hold that *SIGECO*, which demands plenary (de novo) review of legal questions, governs here. *Moriarity*, which obliges courts to accept an agency's reasonable interpretations of law, does not.

Second, applying plenary review, we hold that section 10(b)(3) requires the commission to consider whether each improvement within a TDSIC plan is cost-justified, and that the commission did what the statute requires of it. And we summarily affirm, without further discussion, the panel's decision upholding the commission's order allowing carrying

costs under section 9(c) and its decision rejecting the industrial group's argument that the commission's order lacked specific findings.

A

The panel below erred in deferring to the commission's interpretation of the TDSIC statute. Such deference contravenes our well-settled utility-law precedent, which requires plenary review of the commission's legal conclusions. And we decline to extend *Moriarity* to the utility-law context. The interpretive question before us, then, is not whether the commission's interpretation was reasonable, but whether it was right.

1

Our longstanding utility-law precedent holds that courts owe no deference to the commission's legal conclusions, including, as relevant here, the commission's interpretation of utility-code provisions that define the scope of its delegated powers. "[W]hen it comes to whether the commission acted within its legal guardrails—e.g., whether it acted within statutory limits—we are presented with a 'matter into which we may always properly inquire.'" *Ind. Off. of Util. Consumer Couns. v. Duke Energy Ind., LLC,* 183 N.E.3d 266, 269 (Ind. 2022) (brackets and emphasis omitted) (quoting *Pub. Serv. Comm'n v. City of Indianapolis*, 131 N.E.2d 308, 312 (Ind. 1956)); see also *NIPSCO Indus. Grp.*, 100 N.E.3d at 241 ("Deciding the scope of the Commission's authority under the TDSIC Statute falls squarely within our institutional charge."); *Ind. Bell Tel. Co. v. Ind. Util. Regul. Comm'n*, 715 N.E.2d 351, 354 (Ind. 1999) (holding that commission's jurisdiction "is a legal question this Court reviews de novo"); *Citizens Action Coal. v. N. Ind. Pub. Serv. Co.*, 485 N.E.2d 610, 612 (Ind. 1985) ("The construction of Indiana law is particularly the province of this Court."); *Pub. Serv. Comm'n v. City of La Porte*, 193 N.E. 668, 670 (Ind. 1935) (noting "the Public Service Commission is purely an administrative or legislative body without judicial powers").

The principles underlying this precedent apply with equal force today. Reviewing issues of law is "not only within our prerogative and competence; it is our constitutional duty." *Ind. Off. of Util. Consumer Couns.*, 183 N.E.3d at 269; Ind. Const. art. 3, § 1; *id.* art. 7, § 1. We have an "inherent

'duty to act as the final and ultimate authority' in pronouncing Indiana law." *A.A. v. Eskenazi Health/Midtown CMHC*, 97 N.E.3d 606, 610 n.1 (Ind. 2018) (quoting *Troue v. Marker*, 252 N.E.2d 800, 803 (Ind. 1969) (noting this Court's "inherent constitutional duty" to decide questions of state law)). Thus, while we defer to the commission's technical expertise, we cannot defer to its conclusions of law. *Ind. Off. of Util. Consumer Couns.*, 183 N.E.3d at 269. Otherwise, we would cede our core judicial function—the duty to say what the law is—to an administrative agency within the executive branch.

Despite this precedent, the panel below relied on *Moriarity*—a non-utility case—to defer to the commission's interpretation of the TDSIC statute. *Ind. Off. of Util. Consumer Couns.*, 205 N.E.3d at 1038, 1040 (citing *Moriarity*, 113 N.E.3d at 619). But that case is inapt. *Moriarity* arose under AOPA, the Administrative Orders and Procedures Act, I.C. art. 4-21.5, and the commission is not an AOPA agency, *id.* § 4-21.5-2-4(a)(8). Even on its own terms, *Moriarity* did not purport to govern non-AOPA agencies like the commission. "With AOPA in mind," the Court announced and applied a deferential standard of judicial review to the Indiana Department of Natural Resources, an AOPA agency. *Moriarity*, 113 N.E.3d at 618–19.

Just this year, the legislature enacted major administrative-law reforms, declaring, among other things, that a court must decide legal questions "without deference" to interpretations by an AOPA agency: "The court shall decide all questions of law, including any interpretation of a federal or state constitutional provision, state statute, or agency rule, without deference to any previous interpretation made by the agency." Pub. L. No. 128-2024, § 12, 2024 Ind. Acts 1937, 1948 (adding I.C. § 4-21.5-5-11(b) (effective July 1, 2024)). This enactment does not merely prune *Moriarity* deference but uproots it. In a future case, we may need to grapple with the continuing vitality of *Moriarity* and the AOPA precedent on which it relies. But for now, the issue before us is merely whether the court of appeals was right to rely on *Moriarity* for its view that deference to the commission is warranted here. We hold it was not.

Despite our settled utility-law precedent detailed above, *supra*, at 7–8, one of our concurring colleagues believes we should ignore this precedent and apply *Moriarity* here. *Post*, at 3–7 (Goff, J., concurring in judgment). Extending *Moriarity* would contravene our utility-law precedent, and that includes *NIPSCO Industrial Group*, our most closely analogous precedent, which involved judicial review of a TDSIC ruling by the commission. 100 N.E.3d at 237. The concurrence, for its part, does not mention *NIPSCO Industrial Group* at all. *Post*, at 3–7 (Goff, J., concurring in judgment). There we minced no words in our unanimous holding that courts owe "no deference" to the commission's legal conclusions, and that our review of such conclusions is "plenary":

> We review questions of law de novo and accord the administrative tribunal below no deference. To do otherwise would abdicate our duty to say what the law is. Such plenary review is constitutionally preserved for the judiciary and considers whether the disputed decision, ruling or order is contrary to law. Such legal questions are for the courts to resolve and turn on whether the Commission stayed within its jurisdiction and conformed to the statutory standards and legal principles involved in producing its decision, ruling, or order.

*NIPSCO Indus. Grp.*, 100 N.E.3d at 241 (citations and internal quotation marks omitted). *NIPSCO Industrial Group* did not till new soil. It was a mainstream, middle-of-the-road decision joined by all five members of the Court, including the four Justices who remain on today's Court. Today's decision merely follows suit.

The "respectful consideration", *post*, at 3 (Goff, J., concurring in judgment) (quoting *City of Indianapolis v. Ritzinger*, 56 N.E. 141, 143 (Ind. App. 1900)), our early cases gave agency decisions does not stray from *NIPSCO Industrial Group* or our approach today. As we observed 160 years ago, the interpretation of law by "administrative officers" is "entitled to respectful consideration, but it is no binding interpretation". *Ristine v. State*, 20 Ind. 328, 337 (1863). And 75 years later, we said: "The interpretation put upon

legislation by administrative officers is not controlling, but is often influential and persuasive." *State ex rel. Middleton v. Scott Cir. Ct. of Scott Cnty.*, 17 N.E.2d 464, 467 (Ind. 1938). This principle of "respectful consideration" does not require courts to defer to an agency's reasonable interpretation of a statute. The judiciary is anything but independent if proper "respect" for a coordinate branch amounts to a surrender to its legal pronouncements.

We said as much in *NIPSCO Industrial Group* when discussing our respective utility-law functions: "Crafting our State's utility law is for the legislature; implementing it is for the executive acting through the Commission; and interpreting it is for the courts." 100 N.E.3d at 241. As a court of last resort, we no more overstep our role, *post*, at 7 (Goff, J., concurring in judgment) (citing *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2295 (2024) (Kagan, J., dissenting)), when we interpret the law authoritatively in the cases that come before us than the general assembly oversteps its role when it establishes public policy through its lawmaking, or the governor oversteps his role when he takes care that the laws are faithfully executed. Under our constitution, that is what we do, and it does, and he does.

3

At issue today is the meaning of section 10(b)(3): "whether the estimated costs of the eligible improvements included in [a TDSIC] plan are justified by incremental benefits attributable to the plan." I.C. § 8-1-39-10(b)(3). What this statute means is purely a legal question: how broadly or narrowly has the legislature set the guardrails for the commission to exercise its authority to approve TDSIC plans? No one doubts the commission must follow the statutory requirements in section 10(b). Deciding where, exactly, the legislature has defined the boundaries for the commission to approve TDSIC plans is quintessentially a question of law for courts. Executive officials do not get to decide the limits of their own power. The issue for us, then, is not whether the commission's interpretation of this statute was reasonable but whether it was right. See *N. Ind. Pub. Serv. Co. v. U.S. Steel Corp.*, 907 N.E.2d 1012, 1018 (Ind. 2009) (noting that "legal propositions are reviewed for their correctness") (citation omitted).

B

Having determined that we owe the commission's interpretation of section 10(b)(3) no deference, we interpret the statute independently and settle on the meaning that is best. We do not put our thumb on the scale either for or against the commission's determination. We give its determination whatever persuasive weight its legal analysis merits—no more, no less. We hold that section 10(b)(3) requires the commission to determine whether the individual improvements within a TDSIC plan are cost-justified, and we are satisfied the commission made the required determination here.

1

When approving a public utility's TDSIC plan, the commission must issue an order that includes several requirements, the last of which is at issue here:

> A determination whether the estimated costs of the eligible improvements included in the plan are justified by incremental benefits attributable to the plan.

I.C. § 8-1-39-10(b)(3). While the commission's order must include a determination about cost-justification, the only conclusion required for approval is that the plan be "reasonable". *Id.* § 8-1-39-10(b). The question before us, in other words, is not what the commission must conclude but what its order must include. The order must include, among other things, the required section 10(b)(3) determination.

The disputed section is not a model of draftsmanship. If, as the industrial group maintains, the legislature wanted the commission's cost-justification determination to be made on an improvement-by-improvement basis, it could have said as much:

> A determination whether the estimated cost of each eligible improvement included in the plan is justified by the benefits attributable to each such improvement.

And if the legislature wanted this determination to be made on a plan-wide basis, as Duke and the commission urge, it likewise could have said so more clearly:

> A determination whether the estimated costs of the plan are justified by the overall benefits attributable to the plan.

Of course, we cannot rewrite the statute before us; we must interpret as best we can the statute the legislature wrote.

The enacted statute has four key terms relevant here: the commission's order must determine whether "estimated costs" of the "eligible improvements" included in the plan are justified by "incremental benefits" that are "attributable to the plan." *Id*. § 8-1-39-10(b)(3). A few things about this statute are straightforward:

- The commission must consider the estimated costs of a plan's eligible improvements.
- It must consider the plan's incremental benefits.
- And it must determine whether the plan's incremental benefits justify the improvements' estimated costs.

So far, so good. But two things remain unclear:

- Does "estimated costs" of a plan's "eligible improvements" mean the commission must consider the estimated costs of each improvement in the plan or of all improvements together?
- Does "incremental benefits attributable to the plan" mean the commission must consider the benefits of each improvement in the plan or the whole plan's benefits?

We conclude the most natural reading of the statute requires the commission to determine whether a plan's individual improvements are cost-justified.

Adopting the contrary, whole-plan approach would effectively read out of the statute both "eligible improvements" and "incremental", as if the statute said: "whether the estimated costs of ~~the eligible improvements included in~~ the plan are justified by ~~incremental~~ benefits attributable to the plan." "[E]ligible improvements" connotes an analysis of each

improvement, not the entire plan. If the legislature wanted to refer to the costs of the whole plan, it would have no need to specify a plan's "eligible improvements". And "incremental" refers to parts within a whole, meaning "incremental benefits" must be the benefits of each improvement. "Under our surplusage canon, courts should give effect to every word and 'eschew those interpretations that treat some words as duplicative or meaningless.'" *Cutchin v. Beard*, 171 N.E.3d 991, 997 (Ind. 2021) (brackets omitted) (quoting *Estabrook v. Mazak Corp.*, 140 N.E.3d 830, 836 (Ind. 2020)). The best way to interpret this (and any) statute is to give effect to all its terms. We hold that section 10(b)(3) requires the commission to determine whether the "eligible improvements" are justified by the "incremental benefits", not whether the plan's total costs are justified by the plan's total benefits.

To counter this conclusion, Duke contrasts section 10(b)(3) with another TDSIC provision requiring an improvement-specific cost-justification determination for new improvements added to the initial plan in a later proceeding. Duke argues that the legislature knows how to require that the commission consider whether costs of a specific set of improvements are justified by the benefits attributable to that same set of improvements. Section 12(d)(3), Duke observes, does just that. It directs the commission to determine "whether the estimated costs of the **new projects or improvements** are justified by incremental benefits attributable to the **new projects or improvements**." I.C. § 8-1-39-12(d)(3) (emphasis added). This difference between sections 10(b)(3) and 12(d)(3), according to Duke, warrants interpreting them differently. The latter requires comparing the benefits and costs of the new projects or improvements. The former, Duke says, requires comparing the costs of a proposed plan's eligible improvements with the benefits attributable to the plan.

We see things differently. We view section 12(d)(3) as not undermining our interpretation of section 10(b)(3) but reinforcing it. Section 12(d)(3) merely repeats for newly added projects the same determination necessary to approve a plan at the outset. The only difference between the two statutes is that section 12(d)(3) substitutes "new projects or improvements" for "eligible improvements included in the plan". The best interpretation of both statutes is that the same standard applies; the

commission's order must determine whether the requested improvements are cost-justified on an "incremental", improvement-by-improvement basis.

To be clear, our holding today decides only what the commission must include in its order, not whether the commission may approve a TDSIC plan. The commission must approve a plan if it determines the plan is reasonable. *Id.* § 8-1-39-10(b). And the commission determines reasonableness based on the three section 10(b) considerations including, as relevant here, the section 10(b)(3) determination whether the plan's individual improvements are cost-justified. Whether the plan is reasonable is a mixed question of law and fact. That determination is subject to the commission's considerable discretion and will be overturned only if its reasonableness determination is itself unreasonable. *Ind. Off. of Util. Consumer Couns.*, 183 N.E.3d at 268.

If some improvements in the plan have high costs with comparatively low benefits, the commission might determine those improvements make the plan unreasonable overall. The flip side is that some individual improvements may not themselves be cost-justified, yet the plan overall may still be reasonable if the commission determines those improvements are important enough to the plan and their costs are justified relative to their benefits.

2

Given our interpretation of section 10(b)(3), we hold that the commission's order made the required determination that the plan's individual projects are cost-justified. The commission did not recite benefit-to-cost ratios for each project within Duke's plan, but it did not have to. After finding that the whole plan inclusive of all projects had a net positive benefit-to-cost ratio, the commission considered those projects the industrial group claims are not cost-justified. While Duke "identified 57 projects that were not selected through the [benefit-to-cost analysis]", the commission noted, it included these projects "because they impact critical customers, such as hospitals and schools, and enhance the grid with other benefits that were not quantified". By considering the non-quantified benefits of these 57 projects, the commission conducted the required analysis of the

plan's proposed improvements. Based on that analysis, the commission concluded that the plan is reasonable and that "the estimated costs of [the plan's] projects are justified by the incremental benefits attributable to [the plan]." These determinations are supported by the record, and they track what the statute requires of the commission to approve a TDSIC plan.

*    *    *

For these reasons, we affirm the commission's order.

Massa and Molter, JJ., concur.
Rush, C.J., concurs in the judgment.
Molter, J., concurs with separate opinion in which Rush, C.J., joins.
Goff, J., concurs in the judgment with separate opinion.

ATTORNEYS FOR APPELLANT DUKE INDUSTRIAL GROUP
Todd A. Richardson
Joseph P. Rompala
Tabitha L. Balzer
Aaron A. Schmoll
Lewis Kappes, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLANT CITIZENS ACTION COALITION OF INDIANA, INC.
Jennifer A. Washburn
Indianapolis, Indiana

ATTORNEY FOR APPELLANT INDIANA OFFICE OF UTILITY CONSUMER COUNSELOR
William Irwin Fine
Indiana Office of Utility Consumer Counselor
Indianapolis, Indiana

ATTORNEY FOR APPELLANT NUCOR STEEL – INDIANA
Anne E. Becker
Lewis Kappes, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE DUKE ENERGY INDIANA, LLC

Andrew J. Wells
Elizabeth A. Heneghan
Duke Energy Business Services LLC
Plainfield, Indiana

Peter J. Rusthoven
Nicholas K. Kile
Lauren M. Box
Kian J. Hudson
Barnes & Thornburg LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE INDIANA UTILITY REGULATORY COMMISSION

Theodore E. Rokita
Attorney General of Indiana

Benjamin Jones
Office of the Attorney General
Indianapolis, Indiana

Beth E. Heline
Jeremy Comeau
Bradford Hines
Indiana Utility Regulatory Commission
Indianapolis, Indiana

**Molter, J., concurring.**

I write separately to note three observations.

First, holding that we undertake de novo review of the Indiana Utility Regulatory Commission's interpretation of the TDSIC Statute does not break any new ground. *See, e.g.*, *Indiana Off. of Util. Consumer Couns. v. S. Indiana Gas & Elec. Co.*, 200 N.E.3d 915, 919 (Ind. 2023) ("The controlling question at issue is one of law, on which we owe the Commission no deference."). Our most recent decision reviewing the Commission's interpretation of the TDSIC Statute was *NIPSCO Industrial Group v. Northern Indiana Public Service Co.*, 100 N.E.3d 234 (Ind. 2018). The question in that case was whether the Commission correctly interpreted the statute to mean the Commission could pre-approve costs within broad parameters for identifying future improvements without designating those improvements with specificity. *Id.* at 236–37. And our Court was unanimous in (1) holding that our review of the Commission's statutory interpretation was de novo;[1] (2) holding that the Commission's interpretation was incorrect;[2] and (3) reversing the Commission's order preapproving roughly $20 million in infrastructure improvements.[3]

Second, while we do not defer to the Commission's statutory interpretation, we still "defer[] to agency expertise." *Post*, at 4; *accord ante* at 8 (acknowledging that "we defer to the commission's technical expertise"). Earlier this year, for example, we deferred to the

---

[1] *Id.* at 241 (explaining that we "review questions of law de novo" and that there is no "'tie-goes-to-the-agency' standard for reviewing administrative decisions on questions of law"); *see also id.* ("Crafting our State's utility law is for the legislature; implementing it is for the executive acting through the Commission; and interpreting it is for the courts.").

[2] *Id.* at 242 ("We conclude the TDSIC Statute does not apply to project categories or multiple-unit projects described using ascertainable criteria. . . . The Commission erred when it authorized multiple-unit-project categories in a Section 10 proceeding and approved NIPSCO's later specification of projects under Section 9.").

[3] *Id.* at 237 ("At issue here is the Indiana Utility Regulatory Commission's preapproval of approximately $20 million in infrastructure investments . . . ."); *id.* at 245 ("We reverse the portions of the Commission's TDSIC–4 Order that approved previously unspecified improvements.").

Commission's technical expertise when we upheld its determination that local ordinances requiring underground relocation of public utility facilities were unreasonable. *City of Carmel v. Duke Energy Indiana, LLC*, 234 N.E.3d 816, 822 (Ind. 2024) ("Because of its expertise, the Commission is in the best position to determine whether costs are reasonable and whether costs would shift to customers statewide."). In that same case, we held that the Commission is a proper party on appeal, explaining that one reason we reached that conclusion was that "[w]ithout the Commission's participation on appeal, Indiana appellate courts would lose the benefit of the Commission's expertise." *Id.* at 821.

We continue that deference to the Commission's technical expertise today. As the Court explains, the TDSIC Statute tasks the Commission with determining whether a TDSIC plan is "reasonable," which "is a mixed question of law and fact . . . subject to the commission's considerable discretion," and we will only overturn that decision if the Commission's reasonableness determination is itself unreasonable. *Ante*, at 14. The Court is unanimous in deferring to the Commission's reasonableness determination here and affirming its order.

Third, it is not the Court that has overruled the guidance in *Moriarity v. Indiana Department of Natural Resources*, 113 N.E.3d 614 (Ind. 2019), interpreting AOPA as requiring courts to defer to administrative agencies' statutory interpretations. The General Assembly has since amended AOPA, directing courts to instead review those questions de novo. Ind. Code § 4-21.5-5-11(b) ("The court shall decide all questions of law, including any interpretation of a federal or state constitutional provision, state statute, or agency rule, without deference to any previous interpretation made by the agency.").

Rush, C.J., joins.

**Goff, J., concurring in the judgment.**

The Court today reaches two holdings: (1) that, because the scope of IURC authority to approve a TDSIC plan is a question of law, resolution of this case requires plenary review of the applicable regulatory statute; and (2) the applicable statute requires the IURC to include in its order a determination whether each of the plan's improvements is cost-justified.

I agree with the Court that the IURC ultimately satisfied its statutory obligation, but I part ways with the Court on how it reached that decision. In my view, there's no need to depart from our well-settled standard of review, which holds the "interpretation of a statute by an administrative agency charged with the duty of enforcing the statute," though not binding, "is entitled to great weight, unless this interpretation would be inconsistent with the statute itself." *Moriarity v. Ind. Dep't of Nat. Res.*, 113 N.E.3d 614, 619 (Ind. 2019) (cleaned up); *accord Jay Classroom Teachers Ass'n v. Jay Sch. Corp.*, 55 N.E.3d 813, 816 (Ind. 2016); *West v. Off. of Ind. Sec'y of State*, 54 N.E.3d 349, 353 (Ind. 2016); *Util. Ctr., Inc. v. City of Fort Wayne*, 868 N.E.2d 453, 458 (Ind. 2007); *Pub. Serv. Comm'n of Ind. v. City of Indianapolis*, 235 Ind. 70, 79, 131 N.E.2d 308, 311 (1956); *Zoercher v. Ind. Associated Tel. Corp.*, 211 Ind. 447, 456, 7 N.E.2d 282, 286 (1937); *Citizens' Tr. & Sav. Bank of S. Bend v. Fletcher Am. Co.*, 207 Ind. 328, 334, 192 N.E. 451, 452 (1934); *In re Nw. Ind. Tel. Co.*, 201 Ind. 667, 674, 171 N.E. 65, 67 (1930); *State Bd. of Tax Comm'rs v. Holliday*, 150 Ind. 216, 230, 49 N.E. 14, 18 (1898). For this reason, and because I find the IURC's whole-plan interpretation to be reasonable, I concur only in the Court's judgment.

## I. The Court's plenary review of regulatory statutes strays from well-settled precedent.

Hoosiers today live in a society of rapid technological, economic, and social change. The pace of this reform is such that problems often emerge before the government can gather the necessary information, study the issue, and respond with corrective action. It makes sense, then, for lawmakers to delegate authority to those agencies equipped with the necessary resources and expertise to timely respond to society's

emerging—and constantly evolving—problems. Accordingly, our General Assembly will often enact legislation directing the various state agencies to adopt "such rules and regulations" as those agencies deem necessary to carry out their duties. This authority extends to nearly every facet of our lives—from the regulation of timber sales, collection agencies, and alcoholic beverage advertising, to the licensing and registration of radiation sources and the protection and preservation of ports, and even to the enforcement of our public-utility laws.[1]

At the same time, regulatory statutes such as these often contain certain ambiguities and gaps. What, for example, qualifies as a "stream" under the Dam Safety Act for purposes of giving the DNR jurisdiction over dams "in, on, or along the rivers, streams, and lakes of Indiana"?[2] Alternatively, how does one determine whether a "stream or regulated drain" in Indiana is "ten (10) miles or less" in length for purposes of allowing construction or excavation within a floodway? Does the proper measurement extend "from the stream or drain's headwater to its mouth" or from some other point?[3] Or let's consider medical benefits. The state's Medicaid program considers a person eligible when the disability from which they suffer "appears reasonably certain" to continue for a period "without significant improvement." But does a person suffer from a "disability" when his or her "conditions may improve with treatment, even though they are too poor to pay for treatment"?[4]

The questions that arise from these statutory ambiguities may have been intentionally designed—the legislature having entrusted the agency and its regulatory experts to administer the more technical aspects of the legislative scheme. Alternatively, the statutory uncertainty may reflect

---

[1] *See* Ind. Code § 25-36.5-1-9 (timber); I.C. § 8-10-1-9 (ports); I.C. § 25-11-1-8 (collection agencies); I.C. § 10-19-12-5 (radiation); I.C. § 7.1-2-3-16 (alcoholic beverage ads); I.C. § 8-1-2-115 (utility-law enforcement).

[2] *See Moriarity*, 113 N.E.3d at 620 (quoting I.C. § 14-27-7.5-8(a)(1)).

[3] *See Nat. Res. Comm'n of Ind. Dep't of Nat. Res. v. Porter Cnty. Drainage Bd.*, 576 N.E.2d 587, 588 (Ind. 1991) (quoting I.C. § 13-2-22-13(d)(C)(1) (repealed)).

[4] *See Sullivan v. Day*, 681 N.E.2d 713, 715–16 (Ind. 1997) (quoting I.C. § 12-14-15-1(2)).

careless drafting, or it may simply indicate the limits of legislative foresight into issues that arose years after enactment. Whatever the reason for the imprecision, the uncertainty requires resolution. The question is by whom?

### A. Long-standing precedent calls for judicial deference to agency decisions that fall within their unique sphere of expertise.

For well over a century, Indiana courts have answered this question by deferring to state agencies, showing "respectful consideration" to "the construction given the statute by those charged with the duty of executing it." *City of Indianapolis v. Ritzinger*, 24 Ind. App. 65, 72, 56 N.E. 141, 143 (1900) (citation and quotation marks omitted). Of course, the precise standard has varied over the years. *See, e.g.*, *Holliday*, 150 Ind. at 230, 49 N.E. at 18 (agency interpretations are "entitled to great respect"); *Citizens' Tr.*, 207 Ind. at 334, 192 N.E. at 452 (giving due "consideration" to a state agency's construction of a statute when its words "are of doubtful import"); *Zoercher*, 211 Ind. at 456, 7 N.E.2d at 286 (characterizing the "practical construction of a statute" by an agency as "influential" though "not controlling"). But whatever the language used, the principle of judicial deference to agency interpretations of the law has remained constant. That principle, as expressed in modern terms, holds that the "interpretation of a statute by an administrative agency charged with the duty of enforcing the statute," **though not binding**, "is entitled to great weight, unless this interpretation would be inconsistent with the statute itself." *Moriarity*, 113 N.E.3d at 619 (cleaned up).

And there are good reasons to adhere to this general rule.

For one, regulatory statutes often implicate scientific or highly technical subject matter. As a "body composed of a personnel especially qualified by knowledge, training, and experience pertaining to the subject–matter committed to it" by the legislature, an administrative agency is well suited to "conscientiously and impartially" administer these statutes. *In re Nw. Ind. Tel. Co.*, 201 Ind. at 674, 171 N.E. at 68. So, when "the legislature has

created" an administrative "body of experts," the "decision or findings" of those experts "should not be lightly overridden and set aside" simply because a court "might reach a contrary opinion on the same evidence." *Pub. Serv. Comm'n of Ind.*, 235 Ind. at 79, 131 N.E.2d at 311. Instead, our courts have rightfully deferred to agency expertise, asking only whether the agency's action is "reasonable or within its power to make." *In re Nw. Ind. Tel. Co.*, 201 Ind. at 676, 171 N.E. at 68; *see also Christopher R. Brown, D.D.S., Inc. v. Decatur Cnty. Mem'l Hosp.*, 892 N.E.2d 642, 646 (Ind. 2008) (applying a "deferential standard" when reviewing the "interpretation of a statute by an administrative agency charged with its enforcement in light of its expertise in the given area"). Such deference, Indiana legal scholars have observed, reflects the "basic proposition that the special competence of administrative agencies should have scope to operate and that the courts in reviewing agency actions should not attempt to supervise the agencies' work or do it over again." Ralph F. Fuchs, *Judicial Control of Administrative Agencies in Indiana: I*, 28 Ind. L.J. 1, 2 (1952).

Second, rather than implicating a separation-of-powers violation, agency deference embodies a prudential standard of judicial restraint. Indeed, resolution of a statutory ambiguity is often less a question of law than it is a "policy decision best left to the legislative branch generally" and the administrative agencies specifically. *See Shinall v. Bd. of Zoning Appeals for Town of Ogden Dunes*, 212 N.E.3d 675, 681 (Ind. Ct. App. 2023). Take the examples set forth above. When considering the scope of DNR jurisdiction based on what qualifies as a "stream," or when faced with the question of who is or who isn't "disabled" and thus eligible for Medicaid assistance, who should decide: the democratically accountable branches of government or a judicial branch largely immune from answering to the public?

Third, and relatedly, the principle of restraint embodied in judicial deference to an agency's construction of a statute aligns with this Court's long adherence to other deferential doctrines, including the well-settled "presumption" that a statute is constitutional; the political-question doctrine, which counsels against judicial "interference with the internal operations of the General Assembly"; and the doctrine of primary jurisdiction, which requires a "court to avoid answering technical

questions that the legislature gave an agency the power to decide" even when the court exercises concurrent jurisdiction with the agency. *See, respectively*, *Morgan v. State*, 22 N.E.3d 570, 573 (Ind. 2014); *Citizens Action Coal. of Ind. v. Koch*, 51 N.E.3d 236, 242 (Ind. 2016); *Duke Energy Ind., LLC v. City of Noblesville*, 234 N.E.3d 173, 180 (Ind. 2024).

Deference also promotes a level of stability in the law. By the time a court has had an opportunity to construe an ambiguous statute administered by an agency, the agency itself will likely have construed that statute and taken some action under its authority. Jonathan R. Siegel, *The Constitutional Case for Chevron Deference*, 71 Vand. L. Rev. 937, 943 (2018). The longer these regulatory actions follow the agency's understanding of a statute, the greater the risk of upsetting the reliance interests of those governed by the agency when the Court eventually intervenes and reaches a contrary conclusion.

In short, when a statute is ambiguous, it makes sense for courts to defer to the views of an agency that is politically accountable, conscious of the legislature's policy goals, staffed by experts, and experienced at administering a complex legal and regulatory scheme. It's likewise wise for courts to lean on expert policymakers to preserve stability in the law, rather than venture their own inexpert views and risk upsetting both policy goals and public-reliance interests.

The court, of course, still plays its part in all this. But rather than inserting itself into an "agency's expertise-driven, policy-laden functions," the court "polices the agency to ensure that it acts within the zone of reasonable options." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2300 (2024) (Kagan, J., dissenting). Thus, our review is properly limited to deciding whether the agency "acted within its legal guardrails" or "stayed within its jurisdiction and conformed to the statutory standards and legal principles involved in producing its decision." *Ind. Off. of Util. Consumer Couns. v. Duke Energy Ind., LLC*, 183 N.E.3d 266, 268, 269 (Ind. 2022); *Ind. Gas Co. v. Ind. Fin. Auth.*, 999 N.E.2d 63, 66 (Ind. 2013) (internal citation and quotation marks omitted). Such an arrangement is "best suited to keep every actor in its proper lane." *Loper Bright*, 144 S. Ct. at 2300 (Kagan, J., dissenting).

Nevertheless, the Court today flips the script. "Rather than deferring" to an agency's reasonable interpretation of an ambiguous statute, the Court applies "plenary review" to its analysis. *Ante*, at 2. This standard, the Court submits, comports with our "prerogative and competence" as well as our "constitutional duty" to "act as the final and ultimate authority" in declaring what the law is. *Id.* at 8 (internal citation and quotation marks omitted). Anything less than fully independent review, the Court suggests, would cede our core judicial function to another branch of the government. *See id.*

I find this reasoning unpersuasive and inherently flawed.

For one thing, deference enters the picture **only** when a statute is ambiguous enough to have more than one reasonable interpretation. Agencies cannot, therefore, usurp legislative power by contravening clear statutes or making law out of whole cloth.

Second, even when faced with an ambiguous statute, a court **still** exercises its independent judgment and duty to interpret that statute—nothing "**require[s]** courts" or "**obliges** courts to accept an agency's reasonable interpretations of law." *See id.* at 7, 10 (emphases added).[5] As we emphasized in *Moriarity*, the deferential standard "does not abdicate any of our duties, diminish the role of the judiciary, or cast doubt on any rules of statutory construction by implication." 113 N.E.3d at 620. Rather, the "standard entails a **fresh look** at the dispute on appeal, including the agency's interpretation of the relevant statute, and allows us to continue to say what the law is." *Id.* (emphasis added). While recognizing "the expertise contained within a co-equal branch of government and the value to the public in being able to rely on reasonable agency interpretations,"

---

[5] I certainly don't stand alone in reaching this conclusion. *See, e.g.*, Jonathan R. Siegel, *The Constitutional Case for Chevron Deference*, 71 Vand. L. Rev. 937, 963 (2018) (stressing that an "interpretation is no less an interpretation" simply because it adopts the agency's reasonable reading of that statute); Henry P. Monaghan, *Marbury and the Administrative State*, 83 Colum. L. Rev. 1, 27–28 (1983) (observing that, rather than "abdicating its constitutional duty to 'say what the law is' by deferring to agency interpretations of law," a court is "simply applying the law as 'made' by the authorized law-making entity").

the standard "retains for the judiciary the ultimate power to determine the outcome of the dispute based on the law and facts." *Id.* The idea that "a reviewing court's statutory interpretation begins and ends with agency deference" under this standard is simply wrong, *see ante*, at 2, as *Moriarity* itself and other cases clearly illustrate, *see Moriarity*, 113 N.E.3d at 621 (concluding that the DNR's definition of a "stream" under the Dam Safety Act is "consistent with dictionary definitions of the word" and finding nothing inconsistent with that definition in the Act itself); *Comm'r of Ind. Dep't of Ins. v. Schumaker*, 118 N.E.3d 11, 20, 21, 22 (Ind. Ct. App. 2018) (applying a deferential standard but ultimately concluding that the agency's interpretation of the statute was unreasonable).

With today's decision, however, the Court demands more than just a "fresh look." Rather than showing judicial restraint, the Court "gives itself exclusive power over every open issue—no matter how expertise-driven or policy-laden—involving the meaning of regulatory law." *Loper Bright*, 144 S. Ct. at 2295 (Kagan, J., dissenting). To be sure, "we have a constitutional system of government in which the judiciary is said to be supreme in determining the jurisdiction and limits on the powers of the other branches of the government, as fixed by the constitution and laws." *Pub. Serv. Comm'n of Ind.*, 235 Ind. at 81, 131 N.E.2d at 312. But "this supremacy does not extend to the point where we may substitute our judgment for, or control the discretionary action of the executive or legislative branches, so long as their action is within the sphere and jurisdiction fixed by the statutes and constitution." *Id.* And yet, plenary review does just that, effectively usurping "all discretionary action" in those branches of government. *Id.*

## B. The AOPA expressly exempts the IURC from recent legislative reforms requiring plenary review of regulatory statutes.

While acknowledging that it need not reconsider *Moriarity* deference as it applies to agency interpretations of utility-code provisions (like here), the Court nevertheless opines—in dicta—that it "may need to grapple with the continuing vitality of *Moriarity*" given recent reforms to the

Administrative Orders and Procedures Act (or AOPA). *Ante*, at 8–9. But those reforms have absolutely no effect on the issue before us today. Code section 4-21.5-5-11, amended in 2024, instructs Indiana courts to "decide all questions of law . . . without deference to any previous interpretation made by the agency." I.C. § 4-21.5-5-11(b). But that provision, as with the AOPA as a whole, expressly "does not apply" to the IURC (among other state agencies). I.C. § 4-21.5-2-4(a)(8). And the exception makes sense, given the IURC's broad enforcement power over "all" laws governing public utilities in the state, I.C. § 8-1-2-115, and a statutory scheme—enacted well over a century ago—designed to ensure statewide uniformity in utilities regulation, *see City of Huntington v. N. Ind. Power Co.*, 211 Ind. 502, 510, 5 N.E.2d 889, 892 (1937) (discussing the 1913 Shively-Spencer Act's purpose of shifting "all control over public utilities" from the municipal level to the IURC "as the agent of the state"). By requiring plenary review of a regulatory statute administered by the IURC, today's decision stands in direct conflict with legislative signals to the contrary.

* * * *

Perhaps recognizing the implications of its holding, the Court leaves in place the deferential standard as it applies to "mixed" questions of law and fact. *See ante*, at 14. Such a determination, the Court acknowledges, "is subject to the commission's considerable discretion and will be overturned only if its reasonableness determination is itself unreasonable." *Id.* But this so-called clarification by the Court injects only confusion into the law.[6] In my view, any distinction between pure questions of law (*e.g.*, what the IURC must include in its order in deciding whether a TDSIC plan is reasonable) and "mixed" questions of law and fact (*e.g.*, whether the TDSIC plan itself is reasonable) does little—if anything—to change the

---

[6] Commentators have long recognized the difficulty that often "arises when a determination turns on a statutory phrase and is therefore one of law" and when, "at the same time," the determination "involves policy considerations which may enter into the statutory interpretation," rendering it a question of fact—*e.g.*, whether an unemployed person is "available" for work and is thus entitled to unemployment compensation. Ralph F. Fuchs, *Judicial Control of Administrative Agencies in Indiana: II*, 28 Ind. L.J. 293, 328–29 (1953) (citing *Nelson v. Rev. Bd.*, 119 Ind. App. 10, 82 N.E.2d 523 (1948)).

*status quo*. After all, it's "frequently in the consideration of mixed questions that the scope of statutory terms is established and their meaning defined." *Loper Bright*, 144 S. Ct. at 2306 (Kagan, J., dissenting); *see also* Henry P. Monaghan, *Marbury and the Administrative State*, 83 Colum. L. Rev. 1, 29 (1983) (stressing that "[a]dministrative application of law is administrative formulation of law whenever it involves elaboration of the statutory norm").

## II. Under our well-settled standard of review, the IURC's whole-plan interpretation is reasonable and substantial evidence supports its findings of fact.

Applying our well-settled deferential standard of review, I would hold (A) that the IURC's whole-plan interpretation of TDSIC cost-justification is reasonable and (B) that substantial evidence supports its findings of fact.

### A. The IURC's whole-plan interpretation is reasonable.

The applicable statute provides four steps for IURC approval of a TDSIC plan. The IURC's order must (1) find the "best estimate of the cost of the eligible improvements included in the plan," (2) determine "whether public convenience and necessity require or will require the eligible improvements included in the plan," (3) determine "whether the estimated costs of the eligible improvements included in the plan are justified by incremental benefits attributable to the plan", and (4) determine whether the plan is "reasonable." I.C. § 8-1-39-10(b).

At issue here, as the Court points out, is the third step in this process. The intervenors in this case, Duke Industrial Group, argue that this provision asks whether "the estimated costs of the eligible improvements included in the plan are justified by incremental benefits," meaning that each improvement must be separately assessed and that each improvement must promise benefits that justify its own cost. Appellant's Br. at 22–23 (quoting I.C. § 8-1-39-10(b)(3)). A whole-plan interpretation,

they submit, allows utilities to pack their TDSIC plans with unnecessary, overpriced "filler projects," contrary to legislative intent. *Id.* at 26–27.

Looking first at the benefit side of the cost-benefit equation, it's notable that the provision ends with "incremental benefits attributable to the plan." It does not say "incremental benefits attributable to those improvements." *Cf.* I.C. § 8-1-39-12(d)(3) (requiring a determination of "whether the estimated costs of the new projects or improvements are justified by incremental benefits attributable to the new projects or improvements."). The text thus seems clear that the benefit side of the cost-benefit equation comprises the benefits of the plan as a whole.

By contrast, the cost side of the equation is less clear. The phrase "estimated costs of the eligible improvements included in the plan" is ambiguous. It could mean that the costs to be justified are the costs of each individual improvement separately or the costs of the plan in the aggregate. Use of the plural "estimated costs" seems insignificant, as the same subsection talks singularly of "the best estimate of the cost of the eligible improvements" in step one. These terms apparently refer to the same thing. The IURC's whole-plan interpretation is at least reasonable. It is "the plan" that is to be approved, not each eligible improvement. And it is "the plan" whose benefits must justify the costs. This suggests it is the plan, too, that needs to be cost-justified. The IURC explains that projects with a negative cost-basis may be needed as a foundation for projects with a positive cost-basis, justifying its whole-plan approach. And any concerns over the inclusion of filler projects in a TDSIC plan are overstated, in my view, given that step two requires improvements to serve public convenience and necessity and step four requires the plan to be reasonable.

Ironically, the Court's decision—at least as I read it—seems to implicitly conclude that the IURC's interpretation (and application) of the statute was reasonable after all. Applying plenary review to the applicable statute, the opinion first concludes that the IURC must, when approving a utility's TDSIC plan, determine that the plan's **individual** improvements are cost-justified—*i.e.*, that those "improvements are cost-justified on an 'incremental', improvement-by-improvement basis." *Ante*, at 14. But then,

in holding that the IURC made the required determination, the opinion states that the agency **need not** have recited the "benefit-to-cost ratios for each project within Duke's plan." *Id.* at 14–15. In other words, so long as the IURC's order simply states that each of the projects are cost-justified, without necessarily analyzing each of those projects, that will suffice for purposes of complying with the statute. *See id.*

## B. The IURC's fact-finding is supported by substantial evidence.

The IURC's basic findings of fact are reviewed for "substantial evidence" supporting them, without reweighing the evidence or assessing witness credibility. *Ind. Gas Co.*, 999 N.E.2d at 66. Whether Duke's individually cost-negative projects are cost-justified by the plan as a whole is a question of ultimate fact reviewed for reasonableness, "with greater deference to matters within the IURC's expertise and jurisdiction." *Id.*

At the IURC, Duke presented, among other things, the results produced by a decision analytics software tool used for critical infrastructure investment planning. This showed a 2.8 benefit-to-cost ratio for the plan. There was, therefore, substantial evidence underlying the IURC's conclusion that Duke's plan was cost-justified. And the Group's arguments do not undermine the reasonableness of the IURC's ultimate conclusion. Even with contingent costs accounted for, Duke's analytics showed a 2.4 benefit-to-cost ratio. This evidence amply supports the IURC's conclusion that the plan as a whole is cost-justified. The Group does not dispute the necessity of the improvements or the reasonableness of the plan, and so their challenge fails.

## Conclusion

This Court should defer to the IURC's reasonable interpretation of the statute to require overall cost-justification of a TDSIC plan. In my view, there was substantial evidence that Duke's plan met this condition and the IURC's conclusion was reasonable. Therefore, the IURC's approval should be affirmed.